UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARISA PORRAS,

     Plaintiff,

v.                                 Case No: 8:21-cv-423-JSS

UNITED STATES OF AMERICA,

     Defendant.

_____/

## **ORDER**

     Plaintiff Marisa Porras brings this action against Defendant United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, alleging one count of negligence arising from a vehicle collision between Plaintiff and a United States Postal Service (USPS) vehicle driven by USPS employee Natasha Prieto on March 5, 2019.  (Dkt. 1.)  The court held a five-day bench trial from August 22, 2022 to August 26, 2022.  *See* (Dkts. 135, 137, 138, 139, 141.)  Upon consideration of the testimony and evidence presented at trial and the parties' submissions, the court enters the below findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, and enters judgment in favor of Plaintiff.[1]

---

[1] To the extent that any findings of fact may constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law may constitute findings of fact, they are adopted as such.

## BACKGROUND

The court has jurisdiction over this matter pursuant to the FTCA.  *See* 28 U.S.C. §§ 1346(b) and 2671 *et seq.*  The FTCA includes a limited waiver of sovereign immunity of the United States with respect to claims for money damages, injury or loss of property, or personal injury caused by the negligent or wrongful act or omission of any Government employee if the injury or loss was caused while the employee was acting within the scope of their employment.  28 U.S.C. § 1346(b)(1).  Suits brought under the FTCA are governed by the "law of the place where the act or omission occurred." *Id.*; *F.D.I.C. v. Meyer*, 510 U.S. 471, 477–78 (1994).  The accident giving rise to this action occurred in Manatee County in the Middle District of Florida, and therefore Florida substantive law applies.

To establish negligence under Florida law, a plaintiff must prove four elements: (1) duty of care, (2) breach of that duty, (3) causation, and (4) damages.  *Jeffries v. Amery Leasing, Inc.*, 698 So. 2d 368, 370–71 (Fla. 5th DCA 1997); *see also Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).  The plaintiff bears the burden of establishing all four elements by a preponderance of the evidence.  *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (applying "more likely than not" standard and requiring "proof that the negligence probably caused the plaintiff's injury") (citing *Tampa Electric Co. v. Jones*, 190 So. 26 (Fla. 1939); *see also Clampitt v. D.J. Spencer Sales*, 786 So. 2d 570, 573 (Fla 2001) (citation omitted).

"[T]ort liability in Florida is premised on pure comparative negligence, which means that a jury should apportion fault between the plaintiff, defendant, and any third parties alleged to have been at fault, and render an award based on a defendant's percentage of fault in causing an injury." *Williams v. Davis*, 974 So. 2d 1052, 1061 n.1 (Fla. 2007); *see also* Fla. Stat § 768.81 (directing courts to "enter judgment against each party liable on the basis of such party's percentage of fault"); *see also Hoffman v. Jones*, 280 So. 2d 431 (Fla. 1973).   A defendant asserting comparative negligence must similarly establish the plaintiff's negligence by a preponderance of the evidence. *Bongiorno v. Americorp, Inc.*, 159 So. 3d 1027, 1029 (Fla. 5th DCA 2015) ("Comparative negligence is an affirmative defense; thus, the party asserting the defense bears the burden of proving that the negligence of the other party was a cause of the accident.") (citing *Philip Morris USA, Inc. v. Arnitz*, 933 So. 2d 693, 697 (Fla. 2d DCA 2006)).

Plaintiff's complaint asserts one count of negligence against Defendant, the United States, for damages caused by the negligent operation of a vehicle driven by USPS employee Natasha Prieto.  (Dkt. 1.)  Defendant answered the complaint and asserted several affirmative defenses and a counterclaim against Plaintiff.  (Dkt. 7.) Defendant's counterclaim was subsequently resolved by the parties and was not before the court for trial.  (Dkt. 97.)

In their Amended Joint Pretrial Statement, the parties identified the following issues of fact to be decided at trial:

1. Whether Defendant's driver was negligent such that it caused injury to Plaintiff.

2.  Whether Plaintiff was comparatively negligent.

3.  Plaintiff's damages.

4.  Whether Plaintiff failed to mitigate her damages.

5.  Plaintiff's life expectancy.[2]

(Dkt. 114 at 14.)   Following the trial, Plaintiff and Defendant submitted proposed findings of fact and conclusions of law and responses to each submission.  (Dkts. 162, 163, 164, 165.)   Plaintiff asserts that Defendant's driver, Natasha Prieto, negligently operated the USPS vehicle at the time of the accident, and caused Plaintiff to suffer damages, including damage to her vehicle, permanent injuries to her shoulder and cervical spine, non-permanent injury to her lumbar spine, past and future medical bills, and noneconomic injuries.   Defendant asserts that Plaintiff failed to establish Ms. Prieto's negligence or that the accident caused Plaintiff permanent injuries or damages. Defendant also asserts that Plaintiff's comparative negligence in the operation of her own vehicle caused the accident and that Plaintiff failed to mitigate her damages, if any.

The parties stipulated that the expert witnesses called at trial were "qualified as experts and/or skilled witnesses in their respective fields[,] but reserve[d] the right to question their reliability or helpfulness to the court" at trial.  (Dkt. 134 at 1.)   The parties further agreed that Plaintiff had exhausted her $10,000 no-fault personal injury

---

[2] The parties further stipulated that based on the Social Security Administration's life expectancy tables, which were admitted into evidence at Plaintiff's Exhibit 14 (Dkt. 148-4), Plaintiff's average life expectancy was 83.5 years.  Given her age at trial, she was expected to live an additional 33.5 years. (Dkt. 114 at 14.)

protection (PIP) limit from her insurance policy thereby allowing her to seek additional damages in this matter.  (*Id.* at 2); *see* Fla. Stat. §§ 627.736, 627.737.  Finally, the parties stipulated that Plaintiff timely filed her initial administrative claim with USPS (Dkt. 114 at 14), and that Plaintiff's damages cannot exceed $1,010,860.85, the amount of Plaintiff's initial claim.[3]  (Dkt. 134 at 2); *see also* Joint Ex. 4 (Dkt. 154-3) (Plaintiff's Standard Form 95 claim submitted to USPS).

At trial, the court heard testimony from Plaintiff; Defendant's driver, Natasha Prieto; Florida Highway Patrol Trooper Gerry W. Smith; USPS employees Nikolay Nikolov and Peter A. Jones; Plaintiff's treating physicians Dr. Kathleen Bell, D.C. (f/k/a Kathleen Goerg), Dr. Matthew Hutchison, M.D., and Dr. Sean Mahan, M.D.; Plaintiff's expert Dr. Rick Swope, Ph.D.; and Defendant's experts Dr. James M. Bullock, M.D., Dr. Marc Kaye, M.D., Dr. Neil A. Schechter, M.D., and Dr. Jeremy R. Cummings, Ph.D.  The court also viewed the video deposition of USPS employee Peter Bosco, who passed away prior to trial.  *See* Fed. R. Civ. P. 32(a)(4).  The following exhibits were admitted into evidence: Plaintiff's Exhibits 1–31; Defendant's Exhibits 1–13, 15, and 17–18; and Joint Exhibits 1–8.  *See* (Dkts. 143, 147, 154.)[4]

---

[3] 28 U.S.C. § 2675 requires that a potential claimant under the FTCA must first "present[] the claim to the appropriate Federal agency" and an "[a]ction under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency" with certain exceptions not applicable here.

[4] At the close of trial, Defendant orally moved for a directed verdict on two issues: (1) asking the court to not consider any injury to Plaintiff's lumber spine as Plaintiff had failed to present evidence that any injury to her lumbar spine was related to the accident; and (2) that Plaintiff failed to meet the standard to establish causation and/or damages.  *See* Trial Tr. Vol. 5, 178:2–179:4.  The court construes Defendant's oral motion in this nonjury trial as a motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  *See Pinero v. 4800 W. Flagler L.L.C.*, 430 F. App'x 866, 868 n.1 (11th Cir. 2011) (construing "Motion for Judgment as a Matter of Law" as motion for

## FINDINGS OF FACT

### A. The Accident

The accident at issue in this matter involved two vehicles, one driven by Plaintiff and the other driven by USPS employee Natasha Prieto.  Plaintiff was driving a dark blue 2006 Nissan Murano and Ms. Prieto was driving a 1994 Chevrolet Grumman Long Life Vehicle (LLV), commonly known as a postal truck or mail delivery vehicle (the USPS vehicle).  Trial Tr. Vol. 5, 36:25–37:1; Pl. Ex. 26-0006 (Dkt. 150-6); Trial Tr. Vol. 3, 150:7–9; Pl. Ex. 26-0003 (Dkt. 150-3).  The parties stipulated that the accident occurred at 1:35 p.m. on March 5, 2019, on or near Lorraine Road in Manatee County, Florida.  (Dkt. 114 at 13.)  Weather conditions were clear.  Trial Tr. Vol. 1, 70:9–10; Trial Tr. Vol. 4, 202:3–7.  Ms. Prieto was delivering mail along her postal route on Lorraine Road, and the parties stipulated that Ms. Prieto was an employee of USPS, engaged in the course and scope of her employment and operating the vehicle with the permission of USPS, which owned the vehicle.  (Dkt. 114 at 13.)

At the site of the accident, Lorraine Road is a two-lane road with a speed limit of 50 miles per hour.  Trial Tr. Vol. 1, 53:13–14; Pl. Ex. 26-0002 (Dkt. 150-2).  The accident occurred on a stretch of Lorraine Road between State Road 64 and State Road 70 in the vicinity of mailboxes bearing addresses number 5712 and 5718.  Trial Tr. Vol. 1, 69:2–8; Pl. Ex. 23 (Dkt. 148-13).  Lorraine Road measures approximately 21

---

judgment on partial findings because "Rule 52 explicitly applies to bench trials, whereas Federal Rule of Civil Procedure 50 explicitly applies to jury trials").  The court reserved on Defendant's motion at trial, Trial Tr. Vol. 5, 180:16, and as discussed herein, Defendant's construed motion for judgment on partial findings is denied.

feet across and the southbound lane measures 10 feet 6 inches.  Trial Tr. Vol. 1, 70:16–19.   The mailboxes bearing addresses 5712 and 5718 are set off from the paved roadway by approximately 14 feet on the western side of the road.  *Id.* at 125:20, 144:6–11; Pl. Ex. 26-0001 (Dkt. 150-1); Pl. Ex. 28-0015 (Dkt. 152-3).  Immediately to the north of the mailboxes is a driveway perpendicular to Lorraine Road.  Pl. Ex. 28-0015 (Dkt. 152-3); Pl. Ex. 29-0036 (Dkt. 152-1).   Wear marks in the grass between the mailboxes and the paved roadway show the general path postal workers use when approaching the mailboxes from Lorraine Road, while delivering mail from their vehicles.  Trial Tr. Vol. 1, 13:11–12, 14:4–6, 14:18–15:5, 126:2–9; Pl. Ex. 26-0001 (Dkt. 150-1).  The wear marks continue past the mailboxes at an angle towards Lorraine Road and show a general path that a vehicle may follow to return to the roadway.  *Id.*

Ms. Prieto had just concluded delivering mail to mailboxes numbered 5712 and 5718.  Trial Tr. Vol. 1, 13:6–16.  Plaintiff approached the area in the southbound lane of travel.  *Id.*; Trial Tr. Vol. 5, 44:5–14.  Plaintiff was travelling from CC Landscaping on State Route 64, where she worked, to a library located on State Road 70 in Manatee County, Florida.  Trial Tr. Vol. 5, 40:6–21.  At the intersection of State Route 64 and Lorraine Road, Plaintiff stopped behind a white van at a traffic light.  *Id.* at 43:11–20.  Once the traffic light turned green, both the white van and Plaintiff turned left onto Lorraine Road, and Plaintiff continued following the white van in the southbound lane on Lorraine Road towards State Road 70.  *Id.* at 43:21–24.  Plaintiff remained behind the white van as both vehicles approached the area where the USPS vehicle was delivering mail.  *Id.* at 44:15–20.

- 7 -

Plaintiff and Ms. Prieto provided differing accounts of the accident.  According to Plaintiff, Ms. Prieto failed to yield the right of way by attempting to merge onto Lorraine Road directly in front of Plaintiff, who could not react in time to avoid the accident.  Defendant, in contrast, claims that Plaintiff caused the initial collision by improperly attempting to pass Ms. Prieto's USPS vehicle using the northbound lane and that Plaintiff was forced by oncoming traffic to return to the southbound lane thereby colliding with the USPS vehicle.  Plaintiff's testimony concerning the accident is supported by the greater weight of the evidence.

At trial, Plaintiff testified that she initially observed Ms. Prieto's USPS vehicle after it turned from a driveway on the right-hand side of the road and onto the patch of grass in front of mailboxes 5712 and 5718.  Trial Tr. Vol. 5, 43:25–44:14.  The USPS vehicle was entirely off of the road with all four wheels on the grass in front of the mailboxes.  *Id.* at 48:22–49:2.  Plaintiff testified that after the white van that she was following passed the USPS vehicle, the USPS vehicle attempted to enter the roadway in front of Plaintiff.  *Id.* at 44:18–20.  Plaintiff stated that she attempted to avoid the mail truck by pressing on her brakes and moving her car to the left into the northbound lane; however, another vehicle was approaching in the northbound lane, forcing Plaintiff to turn her wheel back to the right and into Ms. Prieto's USPS vehicle.  *Id.* at 44:21–45:12.  When the two vehicles collided, Plaintiff testified that Ms. Prieto's USPS vehicle was only partially on the roadway.  *Id.* at 49:3–21.  Plaintiff testified that at the moment of impact, she was holding the steering wheel with her right hand on top of the wheel and her left hand on the side of the wheel.  *Id.* at 49:22–50:7.  The force of

- 8 -

the impact caused Plaintiff's steering wheel to yank to the left, which caused her body to move to the left.  *Id.* at 45:21–23.  Plaintiff testified that after impact, the two vehicles remained in contact with each other for some time and that while the vehicles were in contact, she attempted to control her vehicle by steering to the right, but it was very difficult.  *Id.* at 50:17–51:8.  Plaintiff testified that while the vehicles were in contact, she stepped on the gas pedal in an attempt to get her vehicle away from Ms. Prieto's.  *Id.* at 46:3–13.  Plaintiff was able to maneuver her vehicle in front of Ms. Prieto's vehicle and her vehicle came to a stop off of the roadway further south on Lorraine Road.  *Id.* at 46:11–16.  Plaintiff testified that Ms. Prieto's vehicle then rear-ended Plaintiff's vehicle twice, causing Plaintiff's vehicle to move.  *Id.* at 46:14–21.

In addition to Plaintiff's testimony, the court also heard a recording of a call between Plaintiff and her insurance agency on the day after the accident, March 6, 2019, in which Plaintiff provided a description of the accident.  Def. Ex. 15.  Plaintiff told her insurance agency that she "did see [Ms. Prieto's vehicle], but [] never thought she was going to pull in front of me.  So as soon as the other car in front of me passed her, she pulled into Lorraine Road."  Trial Tr. Vol 4, 203:3–6.  Plaintiff further stated that she "tried to brake, but [Ms. Prieto] was like right there.  When she pulled out, I wasn't able to brake fast enough for her to pull in front of me right where she did it."  *Id.* at 204:19–21.  Plaintiff stated that "when [Ms. Prieto] pulled in front of me . . . or next to me, I moved to the other lane which was the – you know, I'm on the wrong side of the road now because there's a . . . truck coming the other way. . . So I had to move back to my lane . . . or I would have had a head-on collision with the other

vehicle . . . [and] when I went back to my lane, the vehicle hit her vehicle on the side. The tire, my tire hit her tire again." *Id.* at 205:19–24, 206:1–11.[5]  Plaintiff stated that when Ms. Prieto pulled out in front of her, she was "[l]ess than a car length" away "because [Plaintiff] was right behind the other car that was in front of [her]." *Id.* at 207:9–15.  Plaintiff also reported to her insurance agent that she has having issues with her right arm following the accident, but did not know "if it's because [she] struggled with the wheel[.]" *Id.* at 197:1–9.  Plaintiff stated that her "arm hurt[s]" but she didn't know "if [she] should just go to the clinic or just keep taking Ibuprofen." *Id.* at 210:17–20.

Ms. Prieto provided a different account of the accident.  According to Ms. Prieto, her vehicle was entirely on the shoulder of Lorraine Road, with all four wheels on the grass near the mailboxes, when she initially observed Plaintiff's vehicle approaching.  Trial Tr. Vol. 1, 13:17–14:1.  Ms. Prieto testified that she believed that

---

[5] The court notes the apparent inconsistency between Plaintiff's statement to her insurance agency and her testimony at trial regarding the three impacts involved in the collision.  To her insurance agency, Plaintiff stated that the three impacts included (1) initial impact when the USPS vehicle turned onto the southbound lane of Lorraine Road in front of Plaintiff's vehicle; (2) after the initial impact forced Plaintiff to move into the northbound lane, Plaintiff swerved back into the southbound lane and collided a second time with the USPS vehicle; and (3) after Plaintiff's vehicle maneuvered in front of the USPS vehicle, the USPS vehicle then hit Plaintiff's vehicle from behind.  Trial Tr. Vol. 4, 206:14–25 – 207:1–5.  In her testimony at trial, Plaintiff recounted the three impacts as including the initial collision, whereafter the vehicles continuously collided as Plaintiff attempted to move her vehicle to the right and in front of the USPS vehicle, and after maneuvering in front of the USPS vehicle, Plaintiff's vehicle was rear-ended twice by the USPS vehicle.  Trial Tr. Vol. 5, 46:14–19 .  The court has considered the apparent inconsistencies in these two statements, but finds that the statements are materially consistent.  For example, Plaintiff's statements both reflect that the initial collision occurred after the USPS vehicle pulled onto Lorraine Road in front of Plaintiff's vehicle, that Plaintiff could not take evasive action to avoid hitting the USPS vehicle, and that following the initial collision, Plaintiff's vehicle travelled into the northbound lane of travel and oncoming traffic, forcing Plaintiff to steer her vehicle to the right and into the USPS vehicle.

there was a safe amount of distance between her and Plaintiff's vehicle for Ms. Prieto to safely merge into traffic to continue delivering mail. *Id.* at 15:18–20. She testified that the flashing yellow lights on her USPS vehicle were on for the entirety of her route, including just prior to the accident. *Id.* at 48:22–24. Ms. Prieto testified that after delivering mail to the mailboxes at 5712 and 5718 on Lorraine Road, she "made [her] turn safely to the street and [kept] going to [her] next mailbox." *Id.* at 16:5–6. According to Ms. Prieto, prior to impact with Plaintiff's vehicle, she had reestablished her position on Lorraine Road, that all four wheels of the USPS vehicle were on the road, and she was "driving to [her] next mailbox." *Id.* at 18:6–15. Ms. Prieto testified that at this time, she was travelling approximately 4–5 miles per hour and had been on the road for "[j]ust a few seconds." *Id.* at 49:18–19, 63:1–2. Ms. Prieto testified that she viewed Plaintiff's vehicle in her right-side mirror while she was on the road, *id.* at 18:16–18, and then observed Plaintiff's vehicle in her left-side mirror, as Plaintiff attempted to pass her on her left-hand side by using the northbound lane of traffic. *Id.* at 21:17–22:6. Ms. Prieto testified that "[w]hen [Plaintiff] took the lane when she tried to pass me, she took the left lane, and that's when I saw her on my left mirror." *Id.* at 22:4–6, 51:3–4. Ms. Prieto further testified that she observed another vehicle approaching from the northbound lane, which forced Plaintiff to merge back into the southbound lane and collide with Ms. Prieto's vehicle. *Id.* at 51:5–9. According to Ms. Prieto, Plaintiff was driving "so fast" that Ms. Prieto did not have time to react or avoid the accident. *Id.* at 23:15–17. The initial impact with Plaintiff's vehicle was "very forceful" and caused a full mail tray to move from its position at her left to the

vehicle's dashboard.  *Id.* at 32:1–16; Pl. Ex. 26-0004 (Dkt. 150-4).  Ms. Prieto testified that her reaction to the accident was to "hold my wheel" and that Plaintiff "just took [her] out of the street and then [Plaintiff] end[ed] up in front of [her]."  Trial Tr. Vol. 1, 51:11–15.  Ms. Prieto then "bump[ed] [Plaintiff's vehicle] with the [postal] truck." *Id.* at 63:6–16.  Ms. Prieto testified that prior to bumping Plaintiff's vehicle from the rear, she was unable to stop the USPS vehicle, despite applying the brakes.  *Id.* at 51:11–15; 63:6–16.  In Ms. Prieto's opinion, Plaintiff was at fault for the accident "[b]ecause she was the one to try to pass the postal truck [and Ms. Prieto] was just delivering mail on the street."  *Id.* at 55:9–13.

Upon consideration of the evidence presented at trial, the court is persuaded by Plaintiff's testimony concerning accident, as her testimony is generally supported by the testimony of Trooper Gerry Smith, based on his investigation of the scene of the accident, the testimony of both Plaintiff's and Defendant's accident reconstruction experts, and the court's own review of the evidence presented at trial.  Additionally, Plaintiff appeared credible, forthright, and sincere while testifying.  Conversely, the court does not find Ms. Prieto's testimony regarding the accident to be credible.  Ms. Prieto appeared disingenuous and somewhat aggressive while testifying.  The court also finds Ms. Prieto's testimony to be largely motivated by a desire to place her conduct in the most positive light, at the expense of what actually occurred.  In particular, the court does not find credible Ms. Prieto's testimony that after viewing Plaintiff's vehicle in her rear-facing mirrors, Ms. Prieto believed there was sufficient distance between her and Plaintiff's vehicle for Ms. Prieto to safely return to Lorraine

Road, and that she had fully established herself on the roadway and was proceeding to her next mailbox when Plaintiff's vehicle attempted to pass her using the northbound lane and collided with the USPS vehicle.

At trial, the court heard testimony from Florida Highway Patrol Trooper Gerry Smith, who responded to the scene of the accident and conducted an investigation of the scene. Trial Tr. Vol 1, 68:17–20.[6] Trooper Smith's testimony was generally consistent with and supportive of Plaintiff's version of how the accident occurred, and the court finds his testimony to be credible. For example, Trooper Smith noted that the point of impact "showed as a scuff mark that was pretty much towards the center of the road from the [Nissan Murano] during the impact with the postal truck." *Id.* at 71:22–24; Pl. Ex. 26-0002 (Dkt. 150-2). Trooper Smith testified that based on the point of impact, it was not possible for Ms. Prieto's USPS vehicle to have been fully established on the southbound lane of travel on Lorraine Road at the moment of impact. Trial Tr. Vol. 1 74:12–16. Rather, Trooper Smith testified that based on his investigation, at the moment of impact, Ms. Prieto's USPS vehicle was "partially in the southbound lane coming from the west shoulder back into traffic." *Id.* at 71:16–17. Trooper Smith testified that based on his investigation, at the moment of impact

---

[6] The parties agreed that Florida's Traffic Accident Report Privilege pursuant to Florida Statutes section 316.066(4) applied at trial. *See* Trial Tr. Vol. 1, 90:10 – 91:16. Accordingly, the parties did not move to admit Trooper Smith's traffic accident report into evidence and limited Trooper Smith's testimony to his observations at the scene. *See, e.g.*, *Cardona v. Mason & Dixon Lines, Inc.*, 737 F. App'x 978, 982 (11th Cir. 2018) (finding no abuse of discretion where district court "followed the statute in ruling that the accident reports were inadmissible insofar as they were based on the parties' statements but that [Trooper] could testify about what he had observed at the scene").

Plaintiff was "taking evasive action" due to Ms. Prieto's vehicle coming into her path so as to cause a hazard. *Id.* at 78:23–79:4.

The court also heard testimony from accident reconstruction experts retained by Plaintiff and Defendant to provide opinions regarding their accident reconstruction analysis. In their testimony, neither expert provided an opinion that supported Ms. Prieto's version of events, i.e., that the USPS vehicle was fully established on Lorraine Road and continuing to the next mailbox at the time of the impact, and that Plaintiff caused the accident by improperly attempting to pass the USPS vehicle on the left.

Plaintiff retained Dr. Rick Swope, Ph.D.,[7] who testified that based on his analysis of the scene, the vehicles involved, the photographs of the scene, the deposition testimony and other "crash data," the accident occurred as follows:

> the postal vehicle pulled out directly in front of the plaintiff vehicle, turned at a fairly sharp angle rather than merge into the road. . . . The postal vehicle pulled out, made a left. And I don't want to say a complete left, but came out at about a 15 to 20-degree angle which would be a pretty good angle to pull into the roadway. The plaintiff vehicle wasn't able to stop. The right front of the plaintiff vehicle collided with the left side of the postal vehicle. The vehicles stayed together for a short period of time, probably about 50 to 80 feet. The vehicles separated. The right front tire and axle area broke on the Nissan. The tire was turned out to the right. The vehicle ended up – the Nissan ended up in front of the postal vehicle. . . . They went to the side, and the postal vehicle had a secondary contact with the rear of the plaintiff vehicle.

Trial Tr. Vol. 1, 123:6–25. Dr. Swope testified that Ms. Prieto's USPS vehicle travelled approximately 30–32 feet from its position delivering mail to the point of impact and he estimated that the USPS vehicle reached a speed of approximately 7 to 12 miles per

---

[7] Dr. Swope was qualified as an expert in accident reconstruction and analysis. (Dkt. 134 at 2.)

hour before impact.  *Id.* at 138:13–15.  In his opinion, Ms. Prieto's vehicle could not

have been fully established on the roadway at the time of the accident.  *Id.* at 142:23–

143:6.  Dr. Swope further testified that based on his review of the evidence, Plaintiff's

Nissan Murano was travelling between 28 and 36 miles per hour at the moment of

impact.  *Id.* at 138:12–13.  He noted that there were "no skid marks on the roadway

that identify preimpact.  So that means [Plaintiff] would be decelerating under the

threshold of maximum braking."  *Id.* at 156:21–24.  Thus, Dr. Swope calculated that

from Plaintiff's perception of Ms. Prieto pulling onto Lorraine Road to her reaction

necessary to avoid the accident was less than two seconds.  *Id.* at 140:8–10.  As Dr.

Swope summarized in his testimony:

> [T]he plaintiff in my mind would have had less time because the event of
> where the postal vehicle pulled out was, in my mind, and I don't want to
> say this exactly, but it was almost instantaneous.  It was less than two
> seconds.  So from the time the postal vehicle entered the roadway at an
> angle to impact, the accident was going to happen.  As soon as the
> decision was made by the operator of the defendant vehicle to pull out,
> that was it.  It was over.  There was nothing that could be done.  It was
> too close.

*Id.* at 140:8–16.  Dr. Swope thus concluded that "[t]he postal vehicle entered the

roadway at an angle in front of the plaintiff vehicle who was unable to stop."  *Id.* at

147:10–11.  Dr. Swope testified that the damage on the USPS vehicle indicated that

the crash was angular, rather than a "sideswipe," because a sideswipe accident would

involve "pretty much equal damage along the whole vehicle," in contrast to the

primarily front-end damage to Plaintiff's vehicle.  *Id.* at 134:9–17.  In reviewing the

photograph evidence, Dr. Swope testified that the damage to both vehicles indicated

that "it's more of an angular collision, not just kind of touching sideswipe where maybe the mirror would be ripped off and there's some paint damage. We can see this is like a full impact on the right front side [of the Nissan]." *Id.* at 127:3–17. Dr. Swope further testified that the initial point of impact was approximately in the middle of the USPS vehicle, rather than its back left tire, and any paint transfer on the USPS vehicle's back left tire was the result of the two vehicles coming together after the initial impact. *Id.* at 172:13–25.

As its expert, Defendant retained Dr. Jeremy Cummings, Ph.D.,[8] who testified regarding his accident reconstruction analysis. Similar to Dr. Swope, Dr. Cummings testified that the USPS vehicle was not fully on the road at the time of the collision with Plaintiff's vehicle. Trial Tr. Vol. 3, 207:1–6. Dr. Cummings testified that the evidence did not support Ms. Prieto's testimony that she was fully established on Lorraine Road at the time of the accident, but rather that "[s]he was about 80 percent into the roadway. She was not fully on the road." *Id.* at 205:23–206:2. Dr. Cummings further testified that the tire scuff mark in the road is approximately 3.8 feet from the edge of the roadway, but the point of initial impact was likely only 2 to 2.5 feet from edge of the road. *Id.* at 219:13–220:12. This proximity to the edge of the roadway of the initial impact further supports Plaintiff's testimony that she was travelling in the southbound lane rather than improperly passing the USPS vehicle in the northbound lane at the time of impact. The post-accident photograph at Plaintiff's Exhibit 26-0001

---

[8] Dr. Cummings was qualified as an expert in Accident Reconstruction and Biomechanical Engineering. (Dkt. 134 at 2.)

further supports this conclusion, as that photograph depicts the scuff mark in the road approximating the impact location at or near where the USPS vehicle would return to the roadway from delivering mail using the wear marks in the grass, and a non-party vehicle approaching the impact location and travelling fully in the southbound lane of travel with its front right tire appearing in line with the scuff mark. *See, e.g.*, Pl. Ex. 26-0001 (Dkt. 150-1).

Dr. Cummings's testimony differed from Dr. Swope's in their analysis of the location of the impact, the precise point of impact on the USPS vehicle, the speeds involved, and the angle of the initial contact between the vehicles. In contrast to Dr. Swope, Dr. Cummings testified that based on his analysis, he described the accident as a "low-speed collision . . . because there were no airbags that deployed." Trial Tr. Vol. 3, 152:20–24; 166:2–4.[9] Dr. Cummings calculated the speed of Plaintiff's vehicle ranging between 33 miles per hour and 45 miles per hour, with a most likely speed of 39 miles per hour. *Id.* at 168:10–14. He testified that the USPS vehicle was travelling at speeds between 8 and 15 miles per hour, with most likely speed being approximately 12–13 miles per hour. *Id.* at 168:15–18. Dr. Cummings further testified that the accident was "largely a side-swipe" and cited to a lack physical evidence of a "tail slap" between the rear of the Nissan Murano and the rear of the USPS vehicle. *Id.* at

---

[9] Dr. Cummings testified that airbags would deploy at a change in velocity of approximately 10 miles per hour and that Plaintiff's vehicle was equipped with airbags in its steering wheel, passenger dashboard, and side airbags on the passenger side of the vehicle. Trial Tr. Vol. 3, 165:23–166:4; Pl. Ex. 27-0073 (Dkt. 151-5). However, the court heard no other testimony and was presented no evidence as to the various causes of an airbag deploying, in particular whether the passenger side airbags in Plaintiff's vehicle would deploy in a similar crash if there was no passenger in the vehicle's front seat.

219:4–10.[10]  Dr. Cummings also questioned Dr. Swope's analysis of the location of the accident.  Specifically, in referring to Dr. Swope's diagram, Dr. Cummings testified that Dr. Swope "has the point of impact wrong if he put it that far back.  There's no tire mark to support that."  *Id.* at 218:7–8.

In comparing Dr. Swope's diagram to the photographs of the scene, the court agrees with Dr. Cummings on the location of impact depicted in Dr. Swope's diagram. *Compare (*Dkt. 163-2 at 3) *with* Pl. Ex. 26 (Dkt. 150-1).  From the court's review of the pictures of the scene depicting the point of impact, it appears that the USPS vehicle travelled some distance from the mailboxes and attempted to reenter the roadway at or near the wear marks in the grass.  *See* Pl. Ex. 26 (Dkt. 150-1).

However, the court does not find Dr. Cummings's classification of the collision as "largely a side-swipe" at low speeds to be persuasive based on the testimony of Plaintiff and Ms. Prieto in describing the force of the crash; the testimony of Dr. Swope based on his physical review of the scene and vehicles involved as discussed above; and the court's own review of photographic evidence of the crash scene.  In particular,

---

[10] Dr. Cummings testified that if a "tail slap" occurred in this accident, "you would typically see evidence on the rear of the Nissan."  Trial Tr. Vol. 3, 165:2–3.  Dr. Cummings continued that:

> if the Nissan was at a steeper angle than the 4 degrees, that would not be a sideswipe collision because you get an initial hit and then it slaps.  So the Nissan goes into the side of the LLV, and then the back end comes and slaps.  And when you see – when a tail slap occurs, usually you will see damage on the vehicle itself from that tail slap, and I didn't see any damage from a tail slap. . . .  You would expect some heavy rubber marks, tire transfer on the Nissan Murano from the tail slap if there was a tail slap, and I didn't observe any. . . .  All the damage corresponds to this damage here, and then which corresponds to this damage here.  There is no evidence of a tail slap on the back of the LLV either.

*Id.* at 165:2–19.

the photographic evidence from the crash scene showed the left side of the USPS vehicle crushed from the impact with Plaintiff's vehicle and significant damage to Plaintiff's vehicle, including her front-right tire having broken from the axle and resting perpendicular to the vehicle.  *See, e.g.*, Pl. Ex. 26 (Dkts. 150-3, 150-4, 150-5, 150-6).  Dr. Cummings testified that the most likely speed of Plaintiff's vehicle was 39 miles per hour, thereby contradicting his finding that the accident was a "low speed collision."  Trial Tr. Vol. 3, 168:10–14.  Trooper Smith also testified that there was "paint transfer all the way down the right-hand side or passenger side" of the Nissan Murano, indicating at least some contact between the tail ends of Plaintiff's vehicle and the USPS vehicle.  Trial Tr. Vol. 1, 89:17–18; Pl. Ex. 26-0006 (Dkt. 150-6).  Dr. Swope also provided credible testimony regarding evidence of a "secondary contact" between the rear of the two vehicles, akin to Dr. Cummings's "tail slap" resulting in paint transfer on the rear left side of the USPS vehicle.  Trial Tr. Vol. 1, 172:13–25.  The court therefore finds Dr. Swope's findings related to the degree of the angle at which the impact occurred to be more persuasive than Dr. Cummings's findings, in light of the above evidence.

The court also heard testimony from USPS employee Peter Jones regarding his investigation of the accident scene.  At the time of the accident, Mr. Jones was a Supervisor of Customer Service at USPS and it was his responsibility to investigate accidents involving USPS-owned vehicles or USPS employees while on duty.  Trial Tr. Vol. 1, 186:8–19.  Mr. Jones was tasked with investigating the scene of the accident.  He arrived at the scene within a few minutes after the accident occurred and took

pictures of the accident scene. *Id.* at 186:20–187:8. Mr. Jones testified that as a result of his investigation, he concluded that "[t]he driver of the [privately-owned vehicle] was at fault[.]" *Id.* at 205:23.[11] Mr. Jones testified that at the scene, Plaintiff initially told him that she was trying to pass the USPS vehicle when the accident occurred, but then declined to speak with him. *Id.* at 199:12–200:11. Based on his investigation, Mr. Jones created both a handwritten and computer-generated USPS Accident Investigation Worksheet (Pl. Ex. 22), and a Motor Vehicle Accident Report on a Standard Form 91 (Pl. Ex. 23). Within the Accident Investigation Worksheet, Mr. Jones noted that Plaintiff "[r]efused" to give a statement to him at the scene. Pl. Ex. 22 (Dkt. 148-12 at 1). The Worksheet also included a section describing how the accident occurred, and in the handwritten portion of the form, Mr. Jones wrote: "After deliver[ing] mail to 5712 Lorraine Rd, LLV was merging back into traffic when she was side swiped by [personally-owned vehicle], that was trying to pass on left side." (*Id.* at 2.)[12] However, in the typed version of the form, the description of accident section states only that Ms. Prieto was "[m]erging back into traffic [when] LLV was side swiped by [privately-owned vehicle]." (*Id.* at 6.) The court does not find Mr. Jones's written statement that Plaintiff was trying to pass the USPS vehicle on the left

---

[11] The court sustained Plaintiff's initial objection to Mr. Jones providing a lay opinion regarding the cause of accident and required Defendant to lay a proper foundation for that testimony. *See* Trial Tr. Vol. 1, 196:16–197:2. The court ultimately allowed Mr. Jones to provide a lay opinion based on his perception of the scene of the crash, rather than any scientific, technical, or other specialized knowledge within the scope of Federal Rule of Evidence 702. *Id.* at 205:4–20.

[12] Mr. Jones similarly wrote in the Motor Vehicle Accident Report that Ms. Prieto "had just made a delivery at 5712 Lorraine Rd and was merging back into traffic when [privately-owned vehicle] side swiped her while trying to pass on left." Pl. Ex. 23 (Dkt. 148-13 at 2.)

side at the time of the accident credible, as Mr. Jones was unable to describe the discrepancy between the two versions of this form. *See, e.g.*, Trial Tr. Vol. 1, 208:4–13. Further, Mr. Jones's testimony that the accident was the fault of Plaintiff for improperly passing the USPS vehicle is undermined by Mr. Jones's own accident investigation forms, which indicate that Ms. Prieto was "merging back into traffic" at the time of the accident, rather than being established on the roadway, and describe Ms. Prieto's direction of travel as "[p]ulling from curb/mailbox." Pl. Ex. 22 (Dkt. 148-12 at 2, 6). Accordingly, the court does not find Mr. Jones's testimony credible concerning the cause of the accident.

In sum, the court finds Plaintiff's testimony as to how the accident occurred to be supported by a preponderance of the evidence. As Plaintiff approached the area of the accident in the southbound lane, Ms. Prieto's USPS vehicle improperly attempted to enter the southbound lane of Lorraine Road in front of Plaintiff's vehicle. As Plaintiff's vehicle was travelling in the southbound lane and had the right of way, the USPS vehicle should have waited to reenter the roadway until it was safe to do so. Plaintiff's vehicle was unable to avoid the USPS vehicle because of the speed and proximity of the vehicles and oncoming traffic in the northbound lane of travel. The vehicles collided and remained in contact as Plaintiff attempted to steer to the right and away from oncoming traffic and applied the gas pedal to move away from the USPS vehicle. Plaintiff's vehicle eventually maneuvered in front of the USPS vehicle and came to a stop on the western shoulder of Lorraine Road. The USPS vehicle then made contact with Plaintiff's vehicle from the rear.

## B. Post-Accident Treatment of the Vehicles

### 1. Plaintiff's Vehicle

As a result of the accident, Plaintiff's vehicle sustained damage to the right front quarter of the vehicle, particularly around the right front wheel.  Pl. Ex. 26 (Dkt. 150-5).  Plaintiff's front right tire broke from the axle and rested perpendicular to the vehicle.  (*Id.*)  The indentation of the area from the right front fender to the right front door was approximately six to eight inches.  Trial Tr. Vol. 1, 154:15–23; Trial Tr. Vol. 3, 164:22–25.  There was also paint transfer from the USPS vehicle along the passenger side of Plaintiff's vehicle.  *Id.* at 89:17–18; Pl. Ex. 26 (Dkt. 150-6).  The rear bumper of Plaintiff's vehicle was also damaged and had paint transfer from the USPS vehicle.  Pl. Ex. 27 (Dkt. 151-8); Trial Tr. Vol. 1, 169:22–170:5.  Plaintiff's vehicle was immobilized "[d]ue to the fact that the right front wheel [was] pretty much ripped from the vehicle itself [and had] been twisted toward the rear of the vehicle."  Trial Tr. Vol. 1, 73:5–12; Pl. Ex. 26 (Dkt. 150-6).

Plaintiff paid $200 for her vehicle to be towed by Cruz Towing Service, LLC.  Trial Tr. Vol. 5, 55:14–23; Joint Ex. 2 (Dkt. 154-1).  The parties further stipulated that Plaintiff did not repair her vehicle following the accident.  (Dkt. 114 at 13.)  Rather, Plaintiff obtained a repair estimate for her vehicle from Caliber Collision showing a total estimate to repair the damage to Plaintiff's vehicle of $10,860.85.  Joint Ex. 3 (Dkt. 154-2).

### 2. USPS Vehicle

As a result of the accident, the USPS vehicle sustained crushing damage to the center of the vehicle's left side between its front and rear left tires. Pl. Ex. 26 (Dkts. 150-3, 150-4). The left side of the USPS vehicle was crushed approximately 40 inches with approximately 1 foot of indentation. Trial Tr. Vol. 1, 155:7–12. There was also either paint or tire transfer from Plaintiff's vehicle on the left rear tire of the USPS vehicle. *Id.* at 172:13–25; Pl. 26-10 (Dkt. 150-10).

With respect to repairs made to the USPS vehicle, the court heard testimony from Peter Jones and USPS mechanic Nikolay Nikolov, and heard the deposition testimony of USPS Sarasota, FL Vehicle Maintenance Facility Manager Peter Bosco. Trial Tr. Vol. 1, 92:25–93:1–6; Joint Ex. 8. Plaintiff also relied on Joint Exhibit 5 to argue that the USPS admitted its fault for the accident. Joint Exhibit 5 is a spreadsheet containing the maintenance and repair history of the USPS vehicle driven by Ms. Prieto during the accident. Joint Ex. 5 (Dkt. 154-4). Joint Exhibit 5 shows entries for repairs performed on the USPS vehicle dated April 12, 2019, which include an input code titled "25-Accident (Postal At Fault)." (*Id.*) For certain of the entries dated April 12, 2019, Mr. Nikolov is listed as the individual who completed the repairs. (*Id.*)

The court heard conflicting and inconsistent testimony regarding how the "Postal At Fault" code was input into Joint Exhibit 5. Peter Jones described Joint Exhibit 5 as a "vehicle maintenance facility" form and stated, "I have nothing to do with that." Trial Tr. Vol. 1, 195:18–196:1. Mr. Jones testified that the form was completed at the vehicle maintenance facility and the employees at that facility did not have anything to do with making fault determinations. *Id.* at 206:1–8. Mr. Nikolov

testified that a manager at the relevant post office, "[d]oesn't have to enter [the postal-at-fault code] [but] [h]e will be the one probably to decide if that's the cause or not." *Id.* at 98:9–10.  Mr. Nikolov also testified that the code could have been put in by a garageman, a manager, or by himself.  *Id.* at 101:15–19.  Mr. Nikolov also downplayed the importance of the code in conducting his repair work and stated, "[w]e don't care whose fault it is, who is not.  The only thing that we are using the code for, we cannot ask for parts that are related to an accident damage on scheduled maintenance and vice versa . . . I don't care about that at all."  *Id.* at 100:1–10.  Peter Bosco, during his deposition, testified that the code originated from "when the people on the other side or the manager did the accident report, that it was an accident, postal-at-fault."  Joint Ex. 8 at 30:2–5 (Dkt. 154-7).  Mr. Bosco testified that that the determination of "postal-at-fault" is "done from the original accident report.  And then, once it's populated into the system, then the system holds it at postal-at-fault."  *Id.* at 30:25–31:3.  He continued that inputting the code "would have been done . . . by whatever supervisor or manager at whatever post office the vehicle came from."  *Id.* at 31:17–19.

The court finds Mr. Bosco's deposition testimony to be persuasive in determining that the code "25-Accident Postal At Fault" was input either by Mr. Jones as the relevant supervisor at Ms. Prieto's post office or derived from information in his Accident Investigation Worksheets (Pl. Ex. 22) and Motor Vehicle Accident Report (Pl. Ex. 23).  Thus, Joint Exhibit 5 and the testimony surrounding repairs made on the USPS vehicle, further undermines Mr. Jones's testimony and lay opinion that Plaintiff was at fault for the accident.  *See* Trial Tr. Vol. 1, 205:23.

### C. Plaintiff's Post-Accident Injuries and Medical Treatment

The parties agree as to Plaintiff's post-accident course of medical treatment, and all of Plaintiff's relevant medical records were introduced at trial.[13] *See* Pl. Exs. 1–13; Def. Exs. 1–13.[14] The parties dispute the extent of Plaintiff's injuries and whether those injuries were caused by the accident.

#### 1. Plaintiff's Medical Records and Course of Medical Treatment

At trial, Plaintiff testified as to her medical treatment and the extent of her injuries. Plaintiff testified that prior to the March 5, 2019 accident, she had never had injuries to her right shoulder, neck, and lower back. Trial Tr. Vol. 5, 70:24–71:7. No medical records evidencing similar complaints, injuries, or accidents from before the March 5, 2019 accident were introduced at trial.

Immediately following the accident, Plaintiff did not seek medical treatment. Trial Tr. Vol. 5, 140:21–23. Plaintiff testified that she did not initially go to the hospital because she expected her pain to get better, but it did not. *Id.* at 74:6–12. Plaintiff did not leave the scene of the accident in an ambulance, nor did she or anyone else call for medical assistance at the scene. Trial Tr. Vol. 1, 83:15–18. Plaintiff testified that at the scene of the accident, she "had a really bad headache . . . and [her] shoulder was hurting too but mostly [her] head." Trial Tr. Vol. 5, 52:6–7. She stated that when she got home that evening, her "body was still in shock" and she "had a real bad

---

[13] The parties further stipulated as to the authenticity of Plaintiff's medical records, absent a specific objection. (Dkt. 114 at 14.)

[14] For ease of reference, where the parties' exhibits contain identical information, the court cites to Plaintiff's exhibits.

headache." *Id.* at 63:5.  Plaintiff testified that she had pain in her "head and right side.

My shoulder was hurting, my arm" and she felt pain on her right side.  *Id.* at 63:9–18.

Plaintiff testified that following the accident,

> The next day when I woke up, my head was still bigger than my body,
> felt bigger than my body.  My right arm was numb.  So when I was trying
> to take a shower, I was having trouble washing my hair.  And when I got
> ready to brush my teeth, I usually like to brush hard so I can feel my teeth
> are clean, but I didn't have enough strength in my fingers to do that.  So
> I had to use my left arm. It didn't feel like I was getting anywhere with
> that.  I'm not used to it. I'm right-handed.

*Id.* at 64:16–24.  Plaintiff further testified that she had difficulty completing daily tasks

due to pain and numbness in her right shoulder and arm and that she repeatedly took

Ibuprofen for the pain.  *Id.* at 64:25–68:10.  Plaintiff testified that the day after the

accident, she also began experiencing pain in her lower back and down her left leg.  *Id.*

at 68:17–69:6.

In Plaintiff's call to her insurance agency on March 6, 2019, the day after the

accident, Plaintiff stated that she has having issues with her right arm following the

accident, but did not know "if it's because [she] struggled with the wheel[.]"  Trial Tr.

Vol. 4, 197:1–9; Def. Ex. 15.  Plaintiff stated that her "arm hurt[s]" but she didn't know

"if [she] should just go to the clinic or just keep taking Ibuprofen."  Trial Tr. Vol. 4,

210:17–20.

Plaintiff first sought medical care at the emergency department of Manatee

Memorial Hospital on March 8, 2019.  Pl. Ex. 1 (Dkt. 147-1 at 13).  There, Plaintiff

was diagnosed with a "[c]ontusion of right shoulder; [l]eft sided sciatica; [and l]umbar

back pain." (*Id.* at 18.)  Plaintiff reported the degree of pain as "moderate" and the physician's note described the following history:

> The patient is a 47 year old [] female presenting to the Emergency Department for evaluation of injuries sustained following [a motor vehicle collision] 2 days ago.  The patient was driving when another car merged into her lane, hitting her car on the driver's side, front.  Then they pulled off to the side of the road[,] the other car pulled in behind her and rear ended her.  Patient complains of soreness to right shoulder, but has the ability to move it.  Patient also complains of lower back pain, with radiation to the left leg.  Patient denies any numbness, tingling, and weakness.  Patient denies saddle paresthesia or incontinence.  Patient has been ambulatory since the accident.

(*Id.* at 16.)  Plaintiff was discharged with instructions to "follow up with MVC clinic for reevaluation if not improving with treatment" and was advised that she "may need to have an outpatient MRI done to further assess [her] back if pain in back and leg persists." (*Id.* at 21.)

Plaintiff next reported to care on March 20, 2019 at Pain Relief Centers with Dr. John Adams.  Pl. Ex. 2 (Dkt. 147-2).  In the patient visit note, Dr. Adams noted Plaintiff's chief complaints as pain in her left shoulder, pain in her right shoulder, upper extremity pain in her arms and upper back, lower back pain on her left side, lower extremity pain in her left leg, and foot pain.  (*Id.* at 1.)  Dr. Adams noted that Plaintiff reported "new onset of neck pain that localizes to [right] cervical paraspinals, also with [right] shoulder pain, reduced [range of motion] . . . new onset of Left [lower back pain] with radiation to [left] foot" and numbness and tingling in Plaintiff's left foot.  (*Id.*)  Dr. Adams ordered x-rays of Plaintiff's cervical spine, lumbar spine, and right shoulder.  Def. Ex. 2 (Dkt. 144-1 at 18–19).

Based on Dr. Adams's referral, Plaintiff had x-ray images taken of her right shoulder, lumbar spine, and cervical spine at MRI Associates of Sarasota, LLC on March 27, 2019.  Pl. Exs. 3, 4 (Dkts. 147-3, 147-4).  Plaintiff did not return to Pain Relief Centers for further treatment because she did not "feel comfortable" there.  Trial Tr. Vol. 5, 77:1–17.

Plaintiff then underwent an independent chiropractic medical consultation at Align Chiropractic and Wellness Center LLC with Dr. Joseph Shiver on April 2, 2019. Pl. Ex. 6 (Dkt. 147-6).  In his examination note, Dr. Shiver summarized Plaintiff's recounting of the accident, and noted Plaintiff's report that "[i]mmediately following the collision, [she] experienced headaches, neck pain, and low back pain."  (*Id.* at 1.) Plaintiff described her neck pain as radiating to her right shoulder and right hand, and that her "middle finger and right index finger go numb and activities like combing her hair and dressing produce a lot of pain and discomfort."  (*Id.* at 2.)  On exam, Dr. Shiver noted muscle hypertonicity and muscle spasms on both sides of Plaintiff's spine, and digital palpation for trigger points was positive in the spine, which "are associated with consistent referred pain."  (*Id.* at 2.)  Dr. Shiver provided a visual approximation that Plaintiff's range of motion in her cervical spine was "moderately reduced with pain" and in her right shoulder was "mildly reduced with pain."  (*Id.*)  Dr. Shiver also performed several tests indicating positive results for pain in Plaintiff's cervical spine and right shoulder.  (*Id.* at 3.)  Dr. Shiver diagnosed Plaintiff with radiculopathy in the cervicothoracic region, segmental and somatic dysfunction of the thoracic region, and other specific arthropathies, not elsewhere classified, in her right shoulder.  (*Id.* at 4.)

Dr. Shiver further opined that in his professional opinion: "current and prior treatment would be considered necessary and related to the accident on 03/05/19," "there are objective findings indicating an injury as a result of the accident on 03/05/2019," "additional treatment would be considered necessary, reasonable and related to the accident on 03/05/2019," "additional care would be considered medically reasonable or necessary" and "would improve the clinical outcome" for Plaintiff, and Plaintiff "does not have a pre-existing condition impacting her current condition." (*Id.* at 4–5.)

On April 5, 2019, Plaintiff visited Indelicato Family Chiropractic Clinic.  Pl. Ex. 7 (Dkt. 147-7 at 14–15).  In her Confidential Patient Health Questionnaire, Plaintiff indicated that her chief complaints were in her neck and right hand and that two of her fingers "get numb." (*Id.* at 14.)  She noted that she has neck and back pain, as well as headaches, pins and needles in her legs and numbness in her fingers and toes. (*Id.* at 14–15.)  She did not indicate "yes" for "arm/shoulder pain," but noted her right shoulder, right arm, right hand, and neck as areas in which she is experiencing pain. (*Id.* at 14.)  A physical examination revealed that Plaintiff had spasms in her lower cervical, thoraco/lumbar, and lumbar sacral vertebra and spasms and pain in her upper thoracic vertebra. (*Id.* at 29.)  She was also positive for cervical compression, shoulder depression, and on the Soto Hall test.[15]  (*Id.* at 21.)  Plaintiff underwent cold

---

[15] The court heard testimony that the Soto Hall test checks spinal or ligament stability in the neck.  A positive finding on the test demonstrates irritation to the posterior spinal ligaments.  Trial Tr. Vol. 2 at 23:5–16.

treatments with a cold/ice pack and CryoDerm bottle and electronic muscle stimulation (EMS). (*Id.* at 22.)

Plaintiff returned to Indelicato Family Chiropractic Clinic three days later on April 8, 2019 and reported that she was doing "slightly better since her last office visit" and that she "felt better after therapy last time." (*Id.* at 24.) During this visit, Plaintiff underwent a chiropractic manipulation. (*Id.* at 22.) Dr. Nicole Santana-Rodriguez noted regarding her examination of Plaintiff:

> The patient informed me that her problems become worse when she does nothing in particular because it is always there. The patient also informed me that her symptoms are relieved when she uses an analgesic cream, uses ice and rests. During palpitation of the patient's spine, I found hypomobile vertebral segments at C1, C2, C5, T1, T3, T7, T8, T10, L1, L4 and right SI. I noticed biomechanical joint dysfunction over the patient's C1, C2, C5, T1, T3, T7, T8, T10, L1, L4 and right SI vertebral segments. I noted moderate spasms in Ms. Porras's neck, mid back and lower back. There was moderate hypertonicity over the patient's neck, mid back and lower back. I noted moderate tender taut fibers over the patient's neck, mid back and lower back.

(*Id.* at 24.) Plaintiff received electrical therapy and a hydrocollator pack as further treatment. (*Id.*) After the treatment, Plaintiff stated that she "felt better" and it was recommended that she continue treatment at a rate of three times per week. (*Id.*) Dr. Santana-Rodriguez concluded her note that Plaintiff's prognosis "is guarded because the patient hasn't received enough treatments to correctly evaluate a prognosis." (*Id.*) Plaintiff did not return to Indelicato Family Chiropractic because it was too far from her work and she wanted to find a treatment provider closer to her home. Trial Tr. Vol. 5, 80:21–22.

On April 12, 2019, Plaintiff was seen for an initial examination with Dr. Kathleen Bell, D.C., at Hess Spinal and Medical Centers (Hess Spinal).[16]  Dr. Bell's note from the initial examination included Plaintiff's chief symptoms as "[m]oderately severe headaches and neck pain, pain in the right shoulder, arm, hand and fingers as well as pain in the left knee."  Pl. Ex. 8 (Dkt. 147-8 at 49).  Dr. Bell continued that Plaintiff "reports her pain is aggravated with movement and her pain is alleviated with medication."  (*Id.* at 49); *see also* (*id.* at 15).  On exam, Dr. Bell found that Plaintiff was positive bilaterally for cervical compression, which indicated that the nerve roots on both sides of Plaintiff's neck were "irritated or aggravated," and on the Soto Hall test, which indicated irritation to the posterior spinal ligaments.  (*Id.* at 50); Trial Tr. Vol. 2, 21:18–23:22.  Dr. Bell also found Plaintiff positive on her right shoulder in a shoulder depression test, which indicated pain traveling down Plaintiff's neck into her right shoulder.  (Dkt. 147-8 at 51); Trial Tr. Vol. 2, 24:10–25.  Dr. Bell further found that Plaintiff's range of motion in the cervical spine "is decreased in all ranges with the patient testing positive for pain in flexion, left lateral flexion, right lateral flexion and left rotation ranges[.]"  (Dkt. 147-8 at 51); Trial Tr. Vol. 2, 25:15–26:21.  Dr. Bell further noted "[s]tatic [p]alpitation reveals muscle spasm in the cervical spinal musculature (C3–C7), which is also taut and tender on the right (C4–C7), and muscle spasm in the thoracic spinal musculature (T1–T4), which is also taut and tender on the right (T1–T4)."  (Dkt. 147-8 at 51).  Dr. Bell testified that Plaintiff had "muscle spasms

---

[16] Dr. Bell was qualified as an expert in chiropractic medicine and testified at trial.  (Dkt. 134 at 1.)

throughout her spine, and there was [] a tightness or a pulling in the muscles on the right-hand side, and it hurt to the touch when I touched her." Trial Tr. Vol. 2, 27:25–28:3. Dr. Bell's examination also included an Appley Scratch test "to check in the integrity of the shoulder joint," which found that Plaintiff could not complete the test "without having pain" in her right shoulder. (Dkt. 147-8 at 51); Trial Tr. Vol. 2, 31:7–25. Dr. Bell recommended a conservative course of chiropractic care three times per week and noted that Plaintiff "may be referred for an orthopedic consultation. If symptoms persist, MRI or neurodiagnostic testing may be warranted." (Dkt. 147-8 at 53.)

On April 15, 2019, Dr. Robert Indelicato, D.C.,[17] of Indelicato Family Chiropractic authored a narrative report of Plaintiff's condition based on the examinations performed on Plaintiff by Dr. Santana-Rodriguez. Pl. Ex. 7 (Dkt. 147-4 at 18–21). In his report, Dr. Indelicato provided several opinions, including that "[p]er the Florida No-Fault law, [Plaintiff] has sustained an 'emergency medical condition' . . . as a direct result of a motor vehicle accident that occurred on 03/05/2019" and that "the absence of immediate medical attention . . . could reasonably be expected to result in serious jeopardy to [Plaintiff's] health." (*Id.* at 21.) Dr. Indelicato's report also included a prognosis stating:

> It is my professional opinion, within a reasonable medical probability, that there is a causal relationship between [Plaintiff's] injuries and the auto accident on 03/05/2019. Her subjective complaints coincide with my objective fundings during her history and physical examination and are consistent with the mechanism of injury. [Patient] will be treated and

---

[17] Dr. Indelicato did not testify at trial.

re-evaluated in four to six weeks.  Further diagnostic evaluation with the appropriate diagnostic modalities and/or consultation with the appropriate medical specialist may be necessary in the future pending [Plaintiff's] overall response to conservative care.

(*Id.* at 21.)[18]

Plaintiff returned to Hess Spinal on April 17, 2019 and was evaluated by Nurse Practitioner Hector Sanchez-Pereira, who ordered an MRI of Plaintiff's cervical spine and right shoulder to further evaluate her injuries.  Pl. Ex. 8 (Dkt. 147-8 at 63).

On April 22, 2019, Plaintiff underwent MRIs at MRI Associates of Sarasota, LLC, which were read by Dr. Jonathan C. Eugenio, M.D. and Dr. Sean M. Mahan, M.D.[19]  (*Id.* at 64–70.)  The MRI findings of the cervical spine noted that Plaintiff had posterior disc herniations abutting her spinal cord at vertebra C3-4 and C4-5.  (*Id.* at 65.)  The report noted that Plaintiff had "disc bulge and osteophytes.  However, the disc herniation extends beyond the borders of the posterior osteophytes."[20]  (*Id.*)  The report concluded that "[g]iven the patient's history and findings and soft disc material

---

[18] Dr. Indelicato's opinions and prognosis appear to be largely based on the examination findings of Dr. Santana-Rodriguez and it is unclear to the court whether Dr. Indelicato relied on or conducted his own examinations of Plaintiff.  (Dkt. 147-4 at 24.)  Dr. Indelicato issued his prognosis in contradiction to Dr. Santana-Rodriguez's conclusion that Plaintiff's prognosis "is guarded because the patient hasn't received enough treatments to correctly evaluate a prognosis." (*Id.*)  Dr. Indelicato's report was further issued before the MRI's were taken of Plaintiff's spine revealing the extent of her injuries.  Thus, the bases for Dr. Indelicato's opinions are unclear to the court and the court does not find them persuasive.

[19] Dr. Mahan was qualified as an expert in diagnostic radiology and musculoskeletal and MRI imaging and testified at trial regarding his review of the diagnostic imaging.  (Dkt. 134 at 1.)

[20] Dr. Mahan testified that "osteophytes" are bone spurs that grow from an individual's vertebra to cover and protect an individual's shrinking disc space.  Dr. Mahan described osteophytes as "extra pieces of bone that stick out beyond that normal rectangular appearance that they have and it comes out to the edge of the disc[.] . . .  This is what the normal aging process is.  The disc expands and the body creates these bone spurs.  In fact, the bone spurs will eventually, if given enough time they'll completely cover the disc."  Trial Tr. Vol. 3, 17:10–18:16.

extending beyond the borders of the posterior osteophytes at the levels of C3-4 and C4-5, it is medically probable that these are acute disc herniations superimposed on degenerative changes caused by the patient's recent accident dated 03/05/19.  Clinical correlation is recommended to confirm this."  (*Id.* at 66.)  Regarding Plaintiff's right shoulder, the MRI report found that "[t]here is increased signal involving the distal aspect of the supraspinatus with a full-thickness tear at the attachment anteriorly which measures 6 mm AP x 5 mm transverse" and that Plaintiff has "[s]upraspinatus tendinopathy with full-thickness tear along the anterior attachment."  (*Id.* at 68–69.)[21]

Plaintiff received further treatment by Dr. Bell at Hess Spinal on April 24, 2019; May 1, 2019; May 8, 2019; May 15, 2019; May 22, 2019; and May 29, 2019.  Pl. Ex. 8 (Dkt. 147-8 at 5–12.)  At Plaintiff's April 24, 2019 examination, Dr. Bell assessed that Plaintiff's condition was "virtually unchanged" since her last visit, and based on Dr. Bell's review of the MRIs, Plaintiff was referred to an orthopedic surgeon for evaluation.  (*Id.* at 6); Trial Tr. Vol. 2, 43:9–44:11.   In Plaintiff's subsequent examinations, Dr. Bell repeatedly noted that Plaintiff reported pain, soreness, and spasms in her neck radiating to the right upper extremities and right shoulder and that Plaintiff's condition had not improved.  (Dkt. 147-8 at 7–12.)  During these visits, Plaintiff received chiropractic manipulative treatment as well as neuromuscular massage therapy, physical therapy, electric stimulation treatment, hot packs, ultrasound, and hydrotherapy.  (*Id.*); Trial Tr. Vol. 2, 32:1–11.

---

[21] The supraspinatus tendon attaches the supraspinatus muscle, one of the four muscles in the rotator cuff, to the humerus, or upper arm bone.  Trial Tr. Vol. 3, 23:15–24.

On May 9, 2019, Plaintiff was evaluated at University Orthopedic Care by Orthopedic Surgeon Dr. Matthew Hutchison.[22]  During that visit, Plaintiff described the pain in her right shoulder as "constant," with minimal improvements noted with therapy.  Pl. Ex. 9 (Dkt. 147-9 at 3).  Plaintiff reported that her neck pains "are accompanied by numbness and tingling that radiate down her right hand into her third and fourth digit."  (*Id.*)  Upon review of Plaintiff's MRIs and conducting a physical exam of Plaintiff, Dr. Hutchison diagnosed Plaintiff with a herniated cervical disc at the C4-5 level with muscle spasms, and a complete rotator cuff tear.  (*Id.* at 4); Trial Tr. Vol. 2, 89:15–91:1.  Dr. Hutchison found on exam of her cervical spine that Plaintiff's left and right paraspinal musculature were "tender to palpitation" and that her cervical spine range of motion was "grossly intact."  (Dkt. 147-9 at 4.)  Dr. Hutchison concluded in his note:

> Although she is compensating well patient does have a full-thickness rotator cuff tear of her right shoulder.  Nonhealing nature of these types of tears was discussed with the patient.  Did review right shoulder arthroscopy with rotator cuff repair.  At this point [in] time, she is not ready to commit to surgical intervention.  Patient will follow-up in 1 week to discuss surgery at that time.  In the meantime, I will provide her with meloxicam and metaxalone for pain.  She was also given shoulder exercise program to retain her functionality and strength.  With the patient denying any previous injury to her right shoulder and neck prior to this 3/5/2019 accident there is a reasonable degree of medical certainty that the injury sustained did occur from this accident.

(*Id.* at 5.)

---

[22] Dr. Hutchison was qualified as an expert in orthopedic surgery and testified at trial.  (Dkt. 134 at 2.)

Plaintiff had a follow-up examination with Dr. Hutchison on May 16, 2019. (*Id.* at 7–9.) At that examination, Dr. Hutchison additionally diagnosed Plaintiff with right shoulder pain and subacromial bursitis of her right shoulder, and Plaintiff consented to proceed with operative intervention to repair her shoulder. (*Id.* at 8–9.)

Plaintiff underwent surgery on her right shoulder on June 4, 2019 at the Sarasota Ambulatory Surgical Center. (*Id.* at 10–11.) As part of the surgical procedure, Dr. Hutchison inserted a camera into Plaintiff's shoulder that allowed him to "visualize all the structures [and] diagnose the injuries." Trial Tr. Vol. 2, 124:14–20. In his operative report of the surgery, Dr. Hutchison noted the following arthroscopic findings:

> The cartilage of the humeral head and glenoid was pristine. There was some peripheral tearing of the posterior superior labrum. The longhead of the biceps tendon did appear to be intact without tearing in the visualized portions throughout the joint. The undersurface of the supraspinatus had a full-thickness tear. Infraspinatus, teres minor, and subscapularis tendon were pristine. The remainder of the intraarticular joint was within normal limits. In the subacromial space, there was copious amount of thickened hemorrhagic bursa adherent to the full thickness rotator cuff tear. The supraspinatus once again noted on the bursal surface.

(Dkt. 147-9 at 10.) As part of his findings, Dr. Hutchison visualized Plaintiff's muscle around the tear and noted a lack of atrophy, which indicated the recency of the tear. Trial Tr. Vol. 2, 127:22–128:6. Plaintiff was placed under general anesthesia during the surgical procedure, which included making four incisions, using an oscillating shaver to debride damaged tissue, scraping Plaintiff's bone, and inserting two anchors connected with suture. Trial Tr. Vol. 2, 131:12–132:14, 134:4–5; Pl. Ex. 9 (Dkt. 147-

9 at 11); Pl. Ex. 30-0003 (Dkt. 153-3); Pl. Ex. 30-0006 (Dkt. 153-6).  Plaintiff "tolerated the procedural well" and was discharged with instructions to return in 7 to 10 days "for removal of sutures and initiation of physical therapy."  (Dkt. 147-9 at 11.)

On June 10, 2019, Plaintiff returned to University Orthopedic and was seen by Dr. B. Chivas James, M.D. for an examination of her cervical spine.  (*Id.* at 12–13.) In his exam, Dr. James noted Plaintiff's pain in her cervical spine and stated that Plaintiff "has severe right sided C4-5, C5-6 and C6-7 facet tenderness with right greater than left hypertonicity." (*Id.* at 12.)  Dr. James discussed with Plaintiff the options for surgical intervention and Plaintiff was directed to return in five weeks to "perform the right cervical medial branch block." (*Id.* at 12.)

Plaintiff attended a follow-up appointment with Dr. Hutchison on June 13, 2019, at which her sutures were removed and she was directed to begin physical therapy. (*Id.* at 14–15.)  Dr. Hutchison noted that Plaintiff reported being "compliant in wearing her right shoulder immobilizer." (*Id.* at 14.)

Plaintiff underwent an initial physical therapy evaluation at Optimal Physical Therapy on June 20, 2019, during which it was recommended that Plaintiff undergo three physical therapy sessions per week for twelve weeks.  Pl. Ex. 11 (Dkt. 148-1 at 111–14).  Plaintiff attended each of her 36 physical therapy sessions over the next several months. *See* (*id.* at 7–10.)

Plaintiff attended a post-operation appointment with Dr. Hutchison on July 11, 2019. (Dkt. 147-9 at 16–17.)  At that appointment, Dr. Hutchison described Plaintiff's right shoulder skin as a "well healed wound," and noted that Plaintiff reported being

"compliant with wearing her right shoulder immobilizer." (*Id.* at 16.) Dr. Hutchison further noted that Plaintiff "noted increased pain with therapy; however, it is much improved since her initial postop visit." (*Id.*) Dr. Hutchison summarized in his note that Plaintiff "is progressing appropriately [and] [s]he is cleared to discontinue use of the right shoulder immobilizer [and] continue with therapy 3 times per week." (*Id.*)

On August 12, 2019, Plaintiff returned to University Orthopedic Care and was evaluated by Dr. James for pain in her neck. (*Id.* at 18.) Dr. James noted that Plaintiff's "cervical pain now is a 0-3 out of 10 on the visual analog scale [and] [i]t does not affect her sleep or her activities of daily living." (*Id.*) Dr. James again discussed the options with Plaintiff, including conducting a cervical medial branch block, but noted that Plaintiff "would like to hold off any invasive therapy [and] would like to continue home stretching and the use of over-the-counter pain medication." (*Id.*)

Plaintiff concluded her physical therapy at Optimal Physical Therapy on September 20, 2019. Pl. Ex. 11 (Dkt. 148-1 at 7–10). As reflected in the discharge summary, Plaintiff reported having no pain, and that she "is doing all daily activities with no problems." (*Id.* at 7.) Plaintiff further reported that "she will continue to do the exercises at home to improve mobility and strength and wants to continue to strengthen so she is able to lift heavier items and to improve behind the back activities." (*Id.*) The summary further noted that Plaintiff has "achieved almost all functional goals." (*Id.* at 10.)

Plaintiff attended her third follow-up appointment with Dr. Hutchison on September 29, 2019, after completing her physical therapy. Pl. Ex. 9 (Dkt. 147-9 at

19–20).  Plaintiff noted at that appointment that she continues to have "bilateral neck pain worse on the right side" which is "exacerbated when looking up and down." (*Id.* at 19.)  Plaintiff further reported, that "[o]verall she is happy with her progress thus far and would like to hold off on any further invasive treatments at this time." (*Id.*)  In his note from that appointment, Dr. Hutchison summarized:

> The patient is progressing well following her right shoulder rotator cuff repair on 6/4/19.  She has since completed her physical therapy.  She now notes minimal range of motion and strength limitations.  She is happy with her progress to that area.  In regards to her cervical spine, she continues to have significant pain and limitations R>L.  She was consented to injections, but cancelled due to her fear of interventions to that area.  That being said, she is cleared to begin activity as tolerated.  I will provide her with a home exercise program.  I also offered her anti inflammatory medications or muscle relaxants which she declined.  Patient is aware of other interventions that are available to her.  She is to follow up with us on an as needed basis.

(*Id.* at 20.)

On November 5, 2019, Dr. Hutchison wrote a comprehensive orthopedic narrative regarding Plaintiff's shoulder and cervical spine injuries, in which Dr. Hutchison summarized Plaintiff's relevant medical records.  (*Id.* at 39–43.)  Dr. Hutchison also authored a permanency opinion, in which he stated:

> In the absence of additional medical treatment, Ms. Porras has reached maximum medical improvement at this time.  Based upon the available information, which included history, physical exam, and diagnostic review, it is my opinion that the patient sustained a permanent injury as a direct result of her accident on 03/05/2019.  It is also my medical opinion that Ms. Porras has suffered a significant permanent injury, within a reasonable degree of medical probability, [that] is resultant of her accident on 03/05/2019.  This injury has had a substantial and permanent impact on the patient's ability to perform the activity associated with reasonable and normal lifestyle.

(*Id.* at 43.)  Dr. Hutchison assessed Plaintiff to have "a combined impairment rating of 12% for her injuries" based on Plaintiff's combined injuries, including both her neck and shoulder injuries.  (*Id.*); Trial Tr. Vol. 2, 161:3–13.  According to Dr. Hutchison Plaintiff retains a 12 percent permanency rating despite improvements in her condition because the rating "is based on the nature of the injuries she has, not on physical exam findings."  Trial Tr. Vol. 5, 22:22–23:4.  Dr. Hutchison also provided estimates regarding potential future medical costs for Plaintiff's right shoulder and cervical spine injuries, including physical therapy, diagnostic imaging, future physician visits and medication, and interventional pain injections.  (Dkt. 147-9 at 43); Trial Tr. Vol. 2, 161:17–164:19.

On February 20, 2020, Plaintiff received medical care unrelated to the March 5, 2019 accident at the emergency department of Manatee Memorial Hospital after she fell while walking her dogs.  Def. Ex. 1 (Dkt. 143-7 at 2–10).  Plaintiff testified that she tripped over a leash after her dogs were attacked by another dog.  Trial Tr. Vol. 5, 163:11–15.  At the emergency room, Plaintiff was treated for dislocation of her left shoulder joint, a lip laceration, dental trauma, and a laceration on her left leg.  (Dkt. 143-7 at 10.)

On August 4, 2022, Plaintiff returned to Dr. Hutchison and reported that "since her last visit in 2019 her symptoms have not changed significantly [and] that the pain is intermittent and sharp shooting."  (Dkt. 147-9 at 101.)  Plaintiff stated that she was taking over-the-counter medications for her pain.  (*Id.*)  On exam, Dr. Hutchison noted that Plaintiff's right shoulder range of motion was "grossly intact" and that her incision

had healed.  (*Id.*)  He further noted that Plaintiff had 5/5 strength and normal muscle

tone and that her right shoulder was stable.  (*Id.*)  In his note, Dr. Hutchison wrote:

> Patient is doing well status post rotator cuff repair for her right shoulder.
> She states she has been faithful with her home exercise program in her
> right shoulder.  She does have occasional discomfort especially at night
> in the shoulder.  She complains of occasional popping in the shoulder.  I
> did explain to the patient that these are typical symptoms to experience
> intermittently after such a significant surgical intervention was
> performed.  She was counseled to continue performing the home exercise
> program as routine maintenance for her shoulder.  She was counseled if
> the pain increases she would be free to call us for a corticosteroid
> injection into the subacromial space.  Although I do offer this she is quite
> needle phobic and would like to avoid injections if possible.  This is
> certainly understandable.  Most significantly she is still complaining of
> neck pain with some radicular pain in the right upper extremity especially
> while sleeping on the left side at night.  I am going to have her follow-up
> with Dr. James to continue evaluation of her cervical spine.

(*Id.* at 102.)

Plaintiff was also seen by Dr. James at University Orthopedic Care on August

8, 2022 for further evaluation of her neck pain.  (*Id.* at 103.)  In that visit, Plaintiff

described her pain as worse on the right, and "constant" and "aching" and that she

was taking over-the-counter medications "to help alleviate the pain."  (*Id.*)  Plaintiff

denied radiating pain to her upper extremities but noted some numbness and tingling

in the right upper extremity.  (*Id.*)  In his note, Dr. James wrote that Plaintiff's "pain

is the same quality and location" and her "physical exam is unchanged from the last

office visit in 2019."  (*Id.*)  Dr. James stated that Plaintiff "does not want to proceed

with invasive care" and that he would "see her back as needed."  (*Id.*)

The court did not receive any evidence that Plaintiff sought or underwent any

medical treatment related to the injuries she sustained in the March 5, 2019 accident

between her third follow-up appointment with Dr. Hutchison on September 29, 2019 and her visits to Dr. Hutchison and Dr. James on August 4, 2022 and August 8, 2022 respectively.

### 2. Expert Testimony

At trial, Plaintiff presented the testimony of her treating physicians Dr. Bell, Dr. Mahan, and Dr. Hutchison as "hybrid" experts pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).[23]  Defendant presented the testimony of its medical experts Dr. Bullock, Dr. Kaye, and Dr. Schechter, who opined regarding the severity and causation of Plaintiff's injuries and the testimony of its biomechanical expert Dr. Cummings, who provided opinions regarding the biomechanics and forces involved in the accident and their likelihood of causing Plaintiff's injuries.[24]

### i. Plaintiff's Treating Physicians

#### 1. Dr. Bell

Dr. Bell's testimony largely focused on her treatment of Plaintiff at Hess Spinal as discussed above.  Defendant objected to Dr. Bell's testimony regarding causation of Plaintiff's injuries and renewed its motion in limine because Dr. Bell had not prepared a "causation expert report."[25]   Trial Tr. Vol. 2, 51:21–24.   The court permitted

---

[23] Plaintiff provided Rule 26(a)(2)(C) expert disclosures in this matter that were entered into evidence and included the subject matter and summary of the facts and opinions to which the witness is expected to testify.  *See* Joint Ex. 7 (Dkt. 154-6).  With respect to Dr. Bell, Dr. Mahan, and Dr. Hutchison, Plaintiff disclosed that, among other things, each was expected to testify that the March 5, 2019 accident caused Plaintiff's injuries.  (*Id.* at 2, 4, 7.)

[24] The court's findings with respect to the persuasiveness of the expert testimony presented at trial is largely discussed below in the court's conclusions of law.

[25] Defendant moved in limine to preclude Plaintiff's treating physicians from testifying regarding causation and future medical treatment and bills due to Plaintiff's failure to comply with the expert

Defendant to conduct a voir dire examination of Dr. Bell to determine the bases on which she had formed her causation opinions. *Id.* at 54:11–64:3. After argument, the court sustained Defendant's objection as to Dr. Bell's causation testimony because her opinions were based on her limited examinations of Plaintiff and Plaintiff's self-reporting of the accident. *Id.* at 64:6–68:22. The court permitted Plaintiff to conduct a proffer of Dr. Bell's causation testimony and allowed further briefing on the issue. *Id.* at 68:23–69:1. However, Plaintiff's proposed findings of fact and conclusions of law (Dkt. 162) and her response to Defendant's submission (Dkt. 164) did not address the scope of Dr. Bell's testimony. The court therefore declines to revisit its ruling and does not consider Dr. Bell's proffer with respect to the causation of Plaintiff's injuries. *See, e.g.*, *Morrow v. Brenntag Mid-S., Inc.*, 505 F. Supp. 3d 1287, 1290 (M.D. Fla. 2020) (declining to admit testimony of treating physician where causation opinion was based in part on plaintiff's self-report).

Nevertheless, the court finds Dr. Bell's testimony with respect to her examination and treatment of Plaintiff to be persuasive. In particular, Dr. Bell testified regarding her treatment of Plaintiff beginning on April 12, 2019, and her findings as reflected in the medical records discussed above, including tautness, tenderness, and spasms in Plaintiff's cervical spine. Trial Tr. Vol. 2, 27:23–29:3. Dr. Bell also testified that the spasms she observed in Plaintiff's cervical spine could not be faked by Plaintiff,

---

disclosure deadline. (Dkt. 40.) The court granted Defendant's motion in part, but denied Defendant's request to prevent Plaintiff's treatment providers from testifying as to causation due to the untimely disclosure. (Dkt. 99.)

and that testing on Plaintiff's right shoulder revealed that she could not complete the test without pain.  *Id.* at 29:4–30:18, 31:7–25.

### 2. **Dr. Mahan**

Dr. Mahan, of MRI Associates of Sarasota, testified regarding his review of the MRI images taken of Plaintiff's neck and right shoulder in April 2019.  Trial Tr. Vol. 3, 24:20–22; Pl. Ex. 3 (Dkt. 147-3); Pl. Ex. 4 (Dkt. 147-4).  According to Dr. Mahan, the MRI images show that Plaintiff suffered herniations to the discs at C3-4 and C4-5 that were pressing on her spinal cord in her cervical spine and a bulging disc at C5-6.  Trial Tr. Vol. 3, 27:22–28:24.  Dr. Mahan testified within a reasonable degree of medical probability that the herniations to the discs at C3-4 and C4-5 were acute in nature.  *Id.* at 26:5–30:21.  According to Dr. Mahan, the herniated discs at C3-4 and C4-5 were acute injuries because the herniations were "clearly sticking out" beyond the osteophytes that were forming on Plaintiff's vertebra.  *Id.* at 29:17–20.  Dr. Mahan continued on review of the MRI images:

> we can see that the bone ends right here and the disc ends out here where it's touching the spinal cord.  And here the bone ends right there and the disc ends out here.  Here the bone ends right there, and we can see a nice osteophyte right here right where the disc is.  And the disc is sticking out a little bit more at C5-6, which is why I say that C5-6 may have also been injured, but I'm not saying that within medical probability because of the extensive nature of the degenerative changes at that level, but the other discs while they do have degenerative change, the degenerative changes are mild.  And these herniating discs are disproportionate to the change that's present.

*Id.* at 29:23–30:9.  Dr. Mahan testified that based on Plaintiff's age at the time of the accident, he would expect to see certain degenerative changes in Plaintiff's cervical

spine.  *Id.* at 29:6–21.  Dr. Mahan continued however, that while Plaintiff "has evidence for preexisting degeneration, [] preexisting degeneration does not mean that the patient is somehow protected from having an acute injury."  *Id.* at 29: 6–21. Indeed, Dr. Mahan testified that because Plaintiff had degenerative changes in her cervical spine, she was "more likely to get an acute injury" such as "a herniating disc that's pressing on the spinal cord.  Even if this person were to be aggravated just a little bit, that could go from being a process that's not causing symptoms to a process that's causing symptoms."  *Id.* at 31:1–32:12.

With respect to the MRI of Plaintiff's right shoulder, Dr. Mahan diagnosed a full thickness tear of Plaintiff's rotator cuff.[26]  *Id.* at 34:5–35:20.  Dr. Mahan testified that the full thickness tear in Plaintiff's right rotator cuff is "not a difficult one to see [because] [i]t's going all the way through the tendon."  *Id.* at 36:16–19.  Dr. Mahan testified that MRIs are 90 percent accurate in diagnosing rotator cuff tears, but the "gold standard" is for a surgeon to confirm the tear with their own eyes.  *Id.* at 35:24– 36:6.  With respect to causation, Dr. Mahan testified that the lack of atrophy in Plaintiff's muscle surrounding the tear indicated that "this was a recent rotator cuff tear, certainly within the last six months."  *Id.* at 38:12–14.  Dr. Mahan continued that within a reasonable degree of medical probability:

---

[26] Dr. Mahan described a full thickness tear as "going all the way through the tendon."  Trial Tr. Vol. 3, 34:17–18.  He analogized the tendon to a stack of papers and stated that if he took a knife and went through all the papers, that would be a full thickness tear.  Sticking the knife through only three sheets of paper and leaving the other sheets intact would be a partial thickness tear.  Trial Tr. Vol. 3, 36:20– 37:6.

it would be reasonable that this was related to the patient's motor vehicle collision. I would say in fact it is most likely considering the patient's symptoms began following the motor vehicle collision, and I don't see any evidence for atrophy to suggest that this is a longstanding process. Given that combination of findings and the temporal analysis as well, I would say it's medically probable that this rotator cuff tear is related to the patient's motor vehicle collision.

*Id.* at 38:14–19.

### 3. **Dr. Hutchison**

Dr. Hutchison, of University Orthopedics, testified regarding his treatment of Plaintiff as well as causation and damages, including the permanency of the injuries to Plaintiff's right shoulder and cervical spine. Dr. Hutchison testified that during the surgery on Plaintiff's right shoulder, he observed that the tear was a full thickness tear to her right rotator cuff. Trial Tr. Vol. 2, 132:12–19. He continued that in reviewing the MRI films and observing the muscles in Plaintiff's right shoulder during surgery, that Plaintiff had a lack of atrophy in her muscle indicating the recency of the tear and that within a reasonable degree of medical certainty that Plaintiff's right shoulder injury was a direct result of the March 5, 2019 accident. *Id.* at 123:12–18, 127:22–128:6. Dr. Hutchison further testified within a reasonable degree of medical probability that based on his examination of Plaintiff and the MRI images, Plaintiff suffered cervical disc herniations at C3-4 and C4-5, a disc bulge at C6-7, cervical spondylosis, cervical facet syndrome, and cervicalgia as a result of the March 5, 2019 accident. *Id.* at 146:16–147:11.[27] Dr. Hutchison also testified regarding his November

---

[27] The court overruled Defendant's objection to Dr. Hutchison's testimony regarding causation as it relates to the cervical spine based on Plaintiff's disclosure of Dr. Hutchison's testimony as

5, 2019 comprehensive orthopedic narrative, in which, he opined that Plaintiff "has suffered a significant permanent injury, within a reasonable degree of medical probability" as a result of the March 5, 2019 accident, and that this injury "has had a substantial and permanent impact on [Plaintiff's] ability to perform the activity associated with reasonable and normal lifestyle." Pl. Ex. 9 (Dkt. 147-9 at 43.) Based on his evaluation, Dr. Hutchison therefore assigned Plaintiff a 12 percent combined impairment rating, accounting for the combined injuries of Plaintiff's shoulder and her cervical spine. *Id.*; Trial Tr. Vol. 5, 22:22–23:4.

### ii. Defendant's Medical Experts

Defendant's retained medical experts provided competing testimony as to their interpretations of Plaintiff's medical records and the causation and extent of her injuries. For instance, Defendant's expert Dr. Schechter[28] testified that based on his review of the medical images, Plaintiff at most sustained a soft tissue strain as a result of the accident, which would have healed with therapy in four to eight weeks. Trial Tr. Vol. 3, 86:4–10, 16–17; 97:6–17. He testified that "[t]here is nothing on the diagnostic images that were provided that shows any acute objective structural pathology that occurred as a result of an accident from 3/5/2019." *Id.* at 130:13–18. With respect to his opinion on permanency, Dr. Schechter testified:

---

encompassing causation opinions as to both the shoulder and cervical spine, Joint Ex. 7 (Dkt. 154-6), and Dr. Hutchison's comprehensive orthopedic narrative, which discusses his examination and opinions regarding Plaintiff's shoulder and cervical spine, Pl. Ex. 9 (Dkt. 147-9 at 39–43). Trial Tr. Vol. 2, 112:15–24.

[28] Dr Schechter was qualified as an expert in orthopaedic surgery. (Dkt. 134 at 2.)

no permanent injury has occurred as a result of the accident.  No further treatment is medically necessary as related to the accident, no surgical intervention related to the accident.  At most it is possible that [Plaintiff] had a soft tissue strain for which initial therapy would have been reasonable.

*Id.* at 133:17–22.  Dr. Schechter testified that if Plaintiff's condition was permanent, he "would have expected that she's continually treated on a regular basis, seeking treatment, seeking medications," but admitted that not every chronic condition causes pain and that chronic pain can be tolerable.  *Id.* at 129:5–16.

Defendant's expert Dr. Bullock[29] testified regarding Plaintiff's shoulder injury and his findings with respect to Plaintiff's chronic injuries that may have been exacerbated by the March 5, 2019 accident.  From his review of the MRI images, Dr. Bullock concluded that Plaintiff had only a partial-thickness rotator cuff tear that he described as "age indeterminate."  Trial Tr. Vol. 4, 43:16–18.  Dr. Bullock reviewed medical records, images, and other documents, and concluded that within a reasonable degree of medical certainty, Plaintiff had "some underlying structural changes to the shoulder that would be consistent with impingement"[30] and that the accident "would have potentially caused exacerbation or aggravation of [underlying] shoulder pathology but would not be the cause for the entirety of the shoulder pathology which was seen on the imaging studies and potential reasons for pain."  *Id.* at 56:16–23.  Dr. Bullock testified that from the MRI images, there was a lack of edema

---

[29] Dr. Bullock was qualified as an expert in orthopaedic surgery.  (Dkt. 134 at 2.)
[30] Dr. Bullock described "subacromial impingement" as "some pinching and irritation of the rotator cuff and the bursal tissues adjacent between the bony structure of the acromion and the lateral edge of the proximal humerus."  Trial Tr. Vol. 4, 43:10–15.

or fluid inflammation surrounding Plaintiff's rotator cuff tear, which would indicate a non-acute injury, and opined that the lack of a pre-accident MRI precluded a definitive finding as to causation. *Id.* at 42:5–21, 83:20–84:6. Dr. Bullock continued that the MRI images reveal that Plaintiff's shoulder had "longer standing structural integrity problems that predate the date of the accident and on the follow-up visit on August 4, 2022, full range of motion, full strength and exam findings of impingement which can be seen in patients who have impingement problems but not necessarily a rotator cuff tear." *Id.* at 85:1–6. However, Dr. Bullock did not review photographs from Plaintiff's shoulder surgery, which were not available, and admitted that the photographs would have assisted in his analysis of the acuteness versus the degeneracy of Plaintiff's condition. *Id.* at 46:21–47:1. Dr. Bullock also agreed that the "gold standard" in assessing Plaintiff's injuries would be the arthroscopic surgery performed by Dr. Hutchison. *Id.* at 65:7–67:9. Dr. Bullock agreed that Plaintiff's tear to her rotator cuff was a permanent injury because the rotator cuff does not heal itself, but disputed whether the tear remained a permanent injury given that it had been surgically repaired and Plaintiff showed improvement in her condition. *Id.* at 94:6–96:1.

Defendant's expert Dr. Kaye[31] testified regarding his opinions of the causation and extent of Plaintiff's shoulder and cervical spine injuries. Dr. Kaye agreed with Dr. Mahan's interpretation of Plaintiff's MRI that there is a herniation of discs at C3-4 and C4-5 that abut Plaintiff's spinal cord, but disputed Dr. Mahan's opinion that the

---

[31] Dr. Kaye was qualified as an expert in diagnostic radiology and vascular & interventional radiology. (Dkt. 134 at 2.)

herniations are acute based on the herniations extending beyond the osteophytes. Trial Tr. Vol. 4, 159:18–160:15.  Dr. Kaye testified that in contrast to Plaintiff's MRI, if there was an acute injury to her cervical spine, he would expect to see a partially hydrated disc, edema, swelling, disruptions or tear of the ligament, and edema within the bone marrow.  *Id.* at 160:11–21.   Rather, Dr. Kaye testified that the images of Plaintiff's cervical spine showed chronic disc degeneration.  *Id.* at 145:14–22.  Dr. Kaye further testified that it was "highly unlikely someone is going to get one or two or three disc herniations in their neck and not have immediate pain or pain shortly thereafter."  *Id.* at 170:14–16.  With respect to Plaintiff's shoulder injury, Dr. Kaye stated that in his experience, it would be very rare to receive a rotator cuff tear from blunt force trauma.  *Id.* at 149:24–150:7.  Dr. Kaye testified that from the MRI images, although Plaintiff has "a tear of the distal tendon of the supraspinatus muscle . . . [t]here is no evidence of any acute trauma" such as bone marrow edema or soft tissue swelling.  *Id.* at 150:19–151:3, 164:1–3.  Dr. Kaye testified that Plaintiff's injuries to her right shoulder "are most likely due to chronic impingement rather than due to acute trauma" and that "a rotator cuff injury or tear is a permanent injury, but I don't believe it was caused by the accident."  *Id.* at 151:9–17.

### iii.  Defendant's Biomechanical Expert

With respect to causation and injury, Defendant also offered the biomechanical opinions of Dr. Cummings.  Dr. Cummings testified as to his simulations of the accident using a computerized model known as an anthropomorphic test device (ATD), that was representative of an individual of Plaintiff's height, weight, sex, age,

and with preexisting conditions.  Trial Tr. Vol. 3, 174:21–175:15.  Dr. Cummings did

not give an opinion as to whether Plaintiff, herself, was injured in the accident.  *Id.* at

144:9–12.  Dr. Cummings testified that his method

> consists of looking at the physics of the actual crash.  So the velocities on
> the vehicles, the accelerations on the vehicles, how those translate to
> forces on the occupants, and then I compare those forces on the
> occupants with the scientific literature on what's required to cause injury
> in that population group.

*Id.* at 144:1–6.  Using his methodology, Dr. Cummings calculated the forces exerted

on Plaintiff's cervical spine as a result of the accident and concluded that based on

those forces there is a "very, very, low" probability that Plaintiff injured her cervical

spine in the accident.  *Id.* at 182:4–183:7.  Dr. Cummings similarly calculated between

54 and 62 pounds of force exerted on Plaintiff's right shoulder during the accident and

concluded that the accident was unlikely to have caused Plaintiff injury.  *Id.* at 183:24–

184:7.  Based on his calculations, Dr. Cummings concluded that the force expected to

cause a right shoulder injury to an individual such as plaintiff would need to be

"between around 216 and 334" pounds of force, and ideally Dr. Cummings "would

want it between 275 and 334" pounds."  *Id.* at 184:2–7.

### 3.  Plaintiff's Past Medical Bills

Plaintiff submitted past medical bills into evidence as follows:

- Manatee Memorial Hospital: $1939.00.  Pl. Ex. 1 (Dkt. 147-1 at 62).

- Pain Relief Centers: $743.60.  Pl. Ex. 2 (Dkt. 147-2 at 7).

- MRI Associates of Sarasota, LLC: $5,780.00.  Pl. Ex. 3 (Dkt. 147-3 at 1).

- CVS Pharmacy: $137.94.  Pl. Ex. 5 (Dkt. 147-5).

- Indelicato Family Chiropractic & Wellness: $1,181.49.  Pl. Ex. 7 (Dkt. 147-7 at 1–6).

- Hess Spinal & Medical Centers: $2,372.00.  Pl. Ex. 8 (Dkt. 147-8 at 1–3).

- University Orthopedic Care: $24,723.62.  Pl. Ex. 9 (Dkt. 147-9 at 1–2).

- Sarasota Ambulatory Surgery Center: $29,111.97.  Pl. Ex. 10 (Dkt. 147-10 at 21).

- Optimal Physical Therapy: $26,075.00.  Pl. Ex. 11 (Dkt. 148-1 at 1–6).

- Sarasota Anesthesia Services: $3,300.00.  Pl. Ex. 12 (Dkt. 148-2).

- Paragon Emergency Services: $819.00.[32]  Pl. Ex. 13 (Dkt. 148-3 at 1).

Plaintiff's medical bills submitted in connection with the March 5, 2019 accident therefore total $96,183.62.   The bills further reflect $11,449.00 in PIP insurance payments and adjustments.  *See* (Dkt. 162 at 64; Dkt. 165 at 13 n.5.)  Plaintiff's treating physicians testified as to the reasonableness and necessity of the various bills and that the billing was related to injuries Plaintiff sustained in the March 5, 2019 accident.  *See* Trial Tr. Vol. 2, 74:19–76:8, 135:13–136:20, 144:16–145:4, 164:24–165:14; Trial Tr. Vol. 3, 39:12–40:10.  Plaintiff also testified regarding the bills she incurred from her treatment following the accident.  Trial Tr. Vol. 5, 97:15–100:17.  Defendant's experts Dr. Schechter and Dr. Bullock testified as to the amount that their practices would charge for procedures using similar billing codes to those used in the treatment of

---

[32] During Plaintiff's testimony, she stated that the total bill from Paragon Emergency Services was $1,562.  Trial Tr. Vol. 5, 98:13.  However, upon the court's review, the bill reflects costs for emergency room visits on April 20, 2017 and March 8, 2019, with only $819.00 charged for the latter visit.  *See* Pl. Ex. 13 (Dkt. 148-3 at 1).

Plaintiff.  Trial Tr. Vol. 3, 106:9–23; Trial Tr. Vol. 4, 61:22–64:22.[33]  As discussed in further detail below, the court largely finds Plaintiff's treating physicians credible in diagnosing her injuries and in the medical treatment reasonable and necessary to treat those injuries.

### 4. Non-Economic Injuries

At trial, Plaintiff testified regarding her pain, suffering, mental anguish, inconvenience, disfigurement, and loss of capacity to enjoy life following the March 5, 2019 accident.  The court finds Plaintiff's testimony is this regard to be generally credible, however the lack of medical records evidencing treatment for the three years prior to trial undermines Plaintiff's testimony regarding the continued severity and persistence of her pain and its continued effects on her.

With respect to her non-economic injuries, Plaintiff testified that the accident itself was "very scary" and, as noted above, that immediately following the accident she "had a really bad headache . . . and [her] shoulder was hurting too but mostly [her] head."  Trial Tr. Vol. 5, 51:22–52:7.  Plaintiff stated that in the days following the accident, she suffered pain in her head, neck, right arm, and lower back, and testified that the pain in her lower back radiated down her left leg and to her feet.  *Id.* at 68:14–69:4.  As a result of the accident, Plaintiff was unable to use her right arm to complete a number of activities of daily living, including showering, washing her hair, brushing

---

[33] The court overruled Plaintiff's objections to this testimony and permitted Defendant's experts to testify regarding their own medical billing practices.  *See, e.g.*, Trial Tr. Vol. 3, 105:8–106:6; Trial Tr. Vol. 4, 57:19–21

her teeth, using the bathroom, and dressing herself, causing Plaintiff further stress and embarrassment. *Id.* at 64:16–67:8. Plaintiff described the pain she felt after the accident as being like nothing she had ever experienced before. *Id.* at 69:5–6. Plaintiff testified that although the pain in her lower back "went away" after about a week, she continued to have pain in her right shoulder and neck in the three months between the March 5, 2019 accident and her June 2019 surgery. *Id.* at 92:3–18. Following her shoulder surgery, Plaintiff had similar difficulty completing daily tasks due to the pain and her arm being immobilized. *Id.* 84:22–86:24. She continued to have pain in her neck and frequent headaches during her physical therapy following surgery and testified that she continues to suffer from neck pain, frequent headaches, and numbness and tingling in her hand and fingers. *Id.* at 92:19–21, 101:3–105:7.

As to her mental anguish, inconvenience, disfigurement, and loss of enjoyment of life, Plaintiff testified that because of the accident, she was unable to visit her parents in Texas and missed the opportunity to visit with her father before the further declining of his Alzheimer's disease. *Id.* at 47:1–48:21. Plaintiff further testified that she has four small scars from her surgery that affect her self-esteem. *Id.* at 95:19–97:2; Pl. Ex. 30-0006 (Dkt. 153-6). Plaintiff also testified that she has suffered stress due to the inability to pay to repair her Nissan Murano or afford a replacement vehicle and taking time from work to attend doctor appointments. Trial Tr. Vol. 5, 60:6–62:23. Plaintiff testified that she is "scared to hurt [her] arm" and this fear has affected her ability to pursue certain activities like riding bikes, carrying, and playing with her grandchildren, mowing the lawn, driving, doing aerobic exercises, and going dancing. *Id.* at 106:12–

108:25.  Plaintiff also testified that, due to the accident, she has anxiety while driving and is afraid of other drivers on the roadway.  *Id.* at 112:20–113:11.  Plaintiff also testified that the accident and resulting surgery caused her to lose a three-year relationship with a boyfriend, which further impacted her confidence.  *Id.* at 108:21–109:17.

## CONCLUSIONS OF LAW

### A. Jurisdiction and Applicable Law

The Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, applies to this action, and the court therefore has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b).  Pursuant to the FTCA, the United States has waived sovereign immunity in limited circumstances for personal injury caused by the negligent act of a federal employee while acting within the scope of her employment.  28 U.S.C. § 1346(b)(1).  The parties stipulated that at the time of the accident, Ms. Prieto "was an employee of USPS, engaged in the course and scope of her employment and operating the vehicle with permission of the USPS, which owned the vehicle."  (Dkt. 114 at 13.)  Thus, to the extent that Ms. Prieto negligently operated the USPS vehicle such that it caused damages to Plaintiff, the United States, as Defendant, may be liable.

### B. Whether Defendant's driver was negligent such that it caused injury to Plaintiff.

Upon consideration of the evidence presented at trial, the court finds that Plaintiff has met her burden to establish by a preponderance of the evidence that Defendant, through its driver Ms. Prieto, negligently operated the USPS vehicle such

that it caused injury and damages to Plaintiff.  As noted above, to establish negligence under Florida law, Plaintiff bears the burden to establish four elements by a preponderance of the evidence: (1) duty of care, (2) breach of that duty, (3) causation, and (4) damages.  *Jeffries*, 698 So. 2d at 370–71; *see also Hendrix v. United States*, No. 8:19-cv-1145-SCB-AAS, 2021 WL 1997426, at *6 (M.D. Fla. May 19, 2021) (citing *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007)).

1. **Duty and Breach**

In Florida, "duty exists as a matter of law and is not a factual question for the jury to decide." *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204–05 (Fla. 2007) (quoting *McCain v. Fla. Power Corp.,* 593 So. 2d 500, 503 (Fla.1992)).  Under Florida law, "[a]ny person operating a vehicle upon the streets or highways within the state shall drive the same in a careful and prudent manner . . . so as not to endanger the life, limb, or property of any person."  Fla. Stat. § 316.1925; *see also* Fla. Standard Jury Instruction (Civil) 401.10 ("All persons, whether pedestrians or motorists . . . [have] a duty . . . to use reasonable care for [their] own safety and for the safety of others.") (cleaned up).  Further, a driver "about to enter or cross a highway from an alley, building, private road or driveway shall yield the right-of-way to all vehicles approaching on the highway to be entered which are so close thereto as to constitute an immediate hazard."  Fla. Stat. § 316.125.

Defendant does not dispute that Ms. Prieto, in operating a motor vehicle on Florida's roadways, owed a duty to all other motorists, including Plaintiff, to drive in a careful and prudent manner.  (Dkt. 163 at 22.)  The court therefore finds that in

operating the USPS vehicle on Florida's roadways and in merging back into traffic onto Lorraine Road, Ms. Prieto had a duty to operate the USPS vehicle in a careful and prudent manner and to yield the right-of-way to approaching motorists, such as Plaintiff, that constituted an immediate hazard.

Upon consideration of the evidence presented at trial, the court further finds that Ms. Prieto breached her duty to Plaintiff by failing to yield the right of way and otherwise failing to drive in a careful and prudent manner and exercise reasonable caution in attempting to merge into the southbound lane of Lorraine Road and causing the accident on March 5, 2019. As discussed above, the court finds Plaintiff's testimony regarding the accident to be more credible than Ms. Prieto's, as Plaintiff's version is generally supported by the physical evidence at the scene, the investigation and testimony of Trooper Smith, and the expert testimony from both Plaintiff's and Defendant's accident reconstruction experts. The court does not find credible Ms. Prieto's testimony that she had fully established herself on the roadway and was proceeding to her next mailbox when Plaintiff's vehicle collided with the USPS vehicle while improperly attempting to pass. The court further finds persuasive Trooper Smith's testimony regarding his observations of the accident scene, Dr. Swope's testimony regarding the angle of the impact, and Dr. Cummings's and Trooper Smith's testimony regarding the location of the impact. This conclusion is further supported by the court's review of the photographs of the accident scene evidencing the location of the impact, the damage to each vehicle, and their ultimate resting positions following the collision. Accordingly, the court finds by a preponderance of the

evidence that Ms. Prieto failed to drive in a careful and prudent manner and breached a duty of care that she owed to Plaintiff by improperly reentering the roadway and violating Plaintiff's right of way.

## 2. **Causation and Injuries**

Under Florida law, Plaintiff bears the burden to establish "[a] reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as 'legal cause,' or 'proximate cause,' and which includes the notion of cause in fact." *O'Donnell v. United States*, 736 F. App'x 828, 831 (11th Cir. 2018) (quoting *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227 (Fla. 2010)). "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding*, 445 So. 2d at 1018. Thus, to prove causation, Plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough[.] *Id.* (quoting Prosser, Law of Torts § 41(4th ed. 1971)); *see also Friedrich v. Fetterman & Assocs., P.A.*, 137 So. 3d 362, 365 (Fla. 2013).

At trial, Plaintiff offered the testimony of her treating physicians, Dr. Bell, Dr. Mahan, and Dr. Hutchison, as well as her medical records, to establish that as a result of the accident, Plaintiff suffered permanent injuries to her right shoulder and cervical spine and non-permanent injuries to her lower back. Plaintiff designated her treating physicians as "hybrid" experts pursuant to Federal Rule of Civil Procedure 26(a)(2)(C). Pursuant to Rule 26(a)(2)(C), a treating physician may offer causation

opinions, even without a Rule 26(a)(2)(B) expert report, so long as the physician's causation opinions are "sufficiently related to the information disclosed during the course of Plaintiff's treatment." *Levine v. Wyeth Inc.*, No. 8:09-cv-854-T-33AEP, 2010 WL 2612579, at *2 (M.D. Fla. June 25, 2010) (citing *McGuire v. Davis*, 437 F.2d 570, 572–73 (5th Cir.1971) (finding objection to doctor's testimony as to causation without merit because "a physician who has examined an injured party may describe what he has seen and give his expert inferences therefrom")); *Donaldson v. United States*, No. 6:09-cv-1049-Orl-28, 2011 WL 1806990, at *1 (M.D. Fla. May 11, 2011) (treating physician permitted to testify as hybrid expert "even with regard to causation, so long as his opinion was formed during the course of treatment rather than as part of litigation preparation"); *see also Britt v. Wal-Mart Stores E., LP*, 599 F. Supp. 3d 1259, 1263 (S.D. Fla. 2022).

In response, Defendant argues that Plaintiff has failed to establish the severity and permanency of her injuries or that the March 5, 2019 accident caused those injuries. Defendant relies on the testimony of its medical experts Dr. Bullock, Dr. Kaye, and Dr. Schechter, and its biomechanical expert Dr. Cummings.

The court, as fact finder, is "free to determine the credibility of experts and, where there is conflicting evidence, the weight to attach to their opinions." *See Vorsteg v. Thomas*, 853 So. 2d 1102, 1103 (Fla. 4th DCA 2003) (citing *Easkold v. Rhodes*, 614 So. 2d 495, 498 (Fla.1993)); *see also Dep't of Agric. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 88 (Fla. 4th DCA 2010). "Even when expert testimony is unchallenged, the finder of fact is free to weigh the opinion, just as it does with any other witness, and reject

such testimony." *Bogoroff*, 35 So. 3d at 88.  Indeed, the finder of fact is entitled "to weigh the credibility of a medical expert and a lay witness, to reject the expert testimony and base its verdict solely on conflicting lay testimony, or to reject the plaintiff's claim entirely." *Republic Servs. of Fla., L.P. v. Poucher*, 851 So. 2d 866, 871 (Fla. 1st DCA 2003) (citing *Weygant v. Fort Myers Lincoln Mercury, Inc.*, 640 So. 2d 1092 (Fla. 1994)).  Further, "[t]he exact boundaries of [each] treating physician's testimony may [] be addressed with specific objections to specific testimony in the context of trial." *Levine*, 2010 WL 2612579, at *2 (quoting *Baratta v. City of Largo*, No. 8:01-cv-1894-T-EAJ, 2003 WL 25686843, at *3 (M.D. Fla. Mar. 18, 2003)).

In addition, Florida's Motor Vehicle No-Fault Law provides that Plaintiff "may recover damages in tort for pain, suffering, mental anguish, and inconvenience because of bodily injury . . . only in the event that the injury or disease consists in whole or in part of . . . [p]ermanent injury within a reasonable degree of medical probability, other than scarring or disfigurement [or] [s]ignificant and permanent scarring or disfigurement."  Fla. Stat. § 627.737(2).  "Although section 627.737(2) does not define permanent injury, 'the determination of what constitutes a permanent injury must, as a practical matter, be left to physicians trained in that profession.'" *Hunter v. United States*, 739 F. Supp. 569, 574 (M.D. Fla. 1990) (quoting *Morey v. Harper*, 541 So. 2d 1285, 1288 (Fla. 4th DCA 1989)).  Under the No-Fault Law, "as long as part of the bodily injury arising out of the motor vehicle accident involves a permanent injury 'within a reasonable degree of medical probability,' the plaintiff can recover noneconomic damages relating to his pain, suffering, mental anguish, and

inconvenience for all of the injuries related to the accident." *Wald v. Grainger*, 64 So. 3d 1201, 1207 (Fla. 2011); *see also Rolon v. Burke*, 112 So. 3d 118, 120 (Fla. 2d DCA 2013) (holding that a jury properly awarded noneconomic damages for all injuries suffered by a plaintiff where the evidence established that one was permanent). "The issue of permanency is ordinarily a factual one." *Cohen v. Pollack*, 674 So. 2d 805, 806 (Fla. 3d DCA 1996) (citing *Jarrell v. Churm*, 611 So. 2d 69 (Fla. 4th DCA 1992)).

### i. Biomechanical Opinions of Dr. Jeremy Cummings

In considering the causation of Plaintiff's injuries, the court finds the testimony and biomechanical opinions of Defendant's expert Dr. Cummings unpersuasive. As discussed above, the court finds Dr. Cummings's testimony characterizing the accident as largely a sideswipe at low speeds to be largely not credible in light of the physical evidence from the scene and conflicting testimony from Plaintiff's expert, Plaintiff, and Ms. Prieto. In so finding, the court is unpersuaded by Dr. Cummings's calculations with respect to the forces exerted on Plaintiff during the crash and the forces needed to cause injury to Plaintiff. For instance, Dr. Cummings testified that based on his calculations, in order for Plaintiff to have likely injured her right rotator cuff during the accident, the forces exerted on Plaintiff's shoulder would have needed to have been between 216 and 334 pounds of force, and ideally for Dr. Cummings "to give the opinion more likely than not she received this injury from this collision, [Dr. Cummings] would want it between 275 and 334 [pounds]." Trial Tr. Vol. 3, 184:2–7. This testimony seems to be directly at odds with Defendant's own expert Dr. Bullock, who testified as to the various ways in which an individual could tear their rotator cuff,

including "someone who reaches suddenly for something, someone who lifts something too heavy, someone whose arm is yanked, [or] someone who takes a fall. The arm doesn't have to be extended.  For example, someone can take a fall on the elbow and injure the rotator cuff because it gets jarred."  Trial Tr. Vol. 4, 31:20–32:2. Dr. Cummings's testimony regarding the force needed to injure Plaintiff's cervical spine is also undermined by Defendant's expert Dr. Kaye, who testified that "[y]ou don't have to have a great deal of trauma to herniate a disc[.]"  *Id.* at 158:19–20.  The court finds this to be especially true in light of testimony regarding Plaintiff's degenerative conditions and their effect on increasing her susceptibility to injury.  *See, e.g.*, Trial Tr. Vol. 3, 31:1–32:12.  Further, the ATD demonstration shown to the court, which reflected Dr. Cummings's calculations of the force applied to Plaintiff during the crash, did not appear to reflect the movement that Plaintiff testified to experiencing within the vehicle.  Rather, the simulation shown to the court appeared to only demonstrate the movements of an individual resulting from a head-on collision, unlike Plaintiff, who testified that the force of the impact caused Plaintiff's steering wheel to yank to the left, which caused her body to move to the left and that she struggled to turn the steering wheel back to the right away from oncoming traffic.  *See* Trial Tr. Vol. 5, 45:21–23, 50:17–51:8.  Thus, the court finds Dr. Cummings's biomechanical opinions to be largely not credible.  Further, the court was not persuaded by the methods employed by Dr. Cummings to reach his calculations, especially in light of Defendant's own experts' conflicting testimony.

### ii.  Persuasiveness of Conflicting Medical Testimony

In considering the conflicting testimony from Defendant's medical experts and Plaintiff's treating physicians and Plaintiff's medical records as discussed above, the court is persuaded by the opinions of Plaintiff's treating physicians, and in particular Dr. Hutchison, as his opinions as to causation and permanency were based on a history of physical exams of Plaintiff, including conducting her shoulder surgery, and a thorough review of her medical record.  In contrast, Defendant's experts relied solely on their review of the relevant records in this matter, although they opined that in treating and diagnosing their own patients, they would conduct physical examinations.  *See, e.g.*, Trial Tr. Vol. 3, 120:10–14 (Dr. Schechter testifying that were he to be treating a patient and "responsible for and determining what course of treatment, you have to talk to them.  You have to examine them.  You have to look at the diagnostic images."); Trial Tr. Vol. 4, 93:15–18 (Dr. Bullock testifying that he "did not give [Plaintiff] a permanency rating.  I did not have the ability to examine the patient myself.  I can only go off of the records.").

In reviewing the medical records, the court also finds credible Plaintiff's testimony regarding pain in her neck in the aftermath of the accident, and the records reflecting Plaintiff's reports of pain in the months after the accident, despite undergoing treatment and physical therapy.  *See, e.g.*, Pl. Ex. 8 (Dkt. 147-8 at 5–12.) Indeed, the medical records reflect Plaintiff's reporting to Dr. Hutchison in September of 2019, following the completion of her physical therapy, that she continued to have pain in her cervical spine.  Pl. Ex. 9 (Dkt. 147-9 at 19–20.)  Plaintiff's reporting of continued pain in her cervical spine at that time is further credible in light of her

reporting at the same examination of significant improvement in the condition of her shoulder.  *See id.*  This evidence undermines Dr. Schechter's conclusion that Plaintiff suffered only a minor strain to her cervical spine that would resolve with therapy after 4 to 8 weeks.  Trial Tr. Vol. 3, 86:4–10, 16–17; 97:6–17.

Defendant's medical experts also largely testified to observing degenerative changes in Plaintiff's shoulder and cervical spine but conceded that those degenerative changes did not prevent Plaintiff from aggravating or exacerbating her condition as a result of a traumatic event such as the March 5, 2019 accident.  For example, Dr. Schechter testified that even if Plaintiff had a chronic degenerative condition in her neck, it is possible for a traumatic event to activate that condition and make it painful.  Trial Tr. Vol. 3, 88:6–18, 93:6–11, 122:13–17.  Dr. Bullock testified that Plaintiff "could have had a tear before and not known it [and] that's why ultimately [his] opinion is that there could have been an exacerbation or aggravation as a result of the injury."  Trial Tr. Vol. 4, 73:16–22.

As noted above, Dr. Bullock also testified as to the range of actions that could result in a rotator cuff tear, including that an individual could tear a rotator cuff through "repetitive activities over time[,] [f]or example, someone that does strenuous work or not necessarily even heavy but repetitive activities.  Reaching or going overhead, for example, can irritate the rotator cuff."  Trial Tr. Vol. 4, 31:6–11.  Dr. Bullock continued that an individual could tear or injure their rotator cuff through "wear and tear from strenuous or even repetitive basic activities or . . . trauma, for example, someone who reaches suddenly for something, someone who lifts something

too heavy, someone whose arm is yanked, [or] someone who takes a fall.  The arm doesn't have to be extended.  For example, someone can take a fall on the elbow and injure the rotator cuff because it gets jarred."  *Id.* at 31:20–32:2.  This description appears consistent with Plaintiff's testimony regarding what she experienced in her vehicle during the accident.  *See* Trial Tr. Vol. 5, 45:21–23, 50:17–51:8.  Plaintiff's testimony regarding her experience during the impact also undermines Dr. Kaye's testimony that blunt force trauma is unlikely to cause a rotator cuff tear as she did not testify that she experienced a blunt force trauma to her right shoulder during the accident.

The medical records further reflect treatment and complaints consistent with Plaintiff's injuries to her right shoulder, cervical spine, and lower back following the accident.  *See, e.g.*, Pl. Ex. 1 (Dkt. 147-1 at 16) (noting complaints of "soreness to right shoulder" and "lower back pain, with radiation to the left leg"); Pl. Ex. 2 (Dkt. 147-2 at 1) (noting "new onset of neck pain that localizes to [right] cervical paraspinals, also with [right] shoulder pain, reduced [range of motion] . . . new onset of Left [lower back pain] with radiation to [left] foot" and numbness and tingling in Plaintiff's left foot).  Notably, this is not a case where there is evidence that Plaintiff had been untruthful regarding her medical history with her treating physicians such that their conclusions regarding the causation of her injuries based in part on her reports are questionable.  *Cf. Morrow*, 505 F. Supp. at 1291–92 (excluding treating physician testimony that "lacked a sufficient factual basis to form a reliable opinion" based on plaintiff's inaccurate reporting of his medical history) (citing *Carmody v. State Farm Mut. Auto.*

*Ins. Co.*, No. 6:14-cv-830-Orl-37, 2015 WL 5542534, at *3 (M.D. Fla. Sept. 18, 2015) (excluding physician testimony on causation where doctor only examined the plaintiff once, did not review the plaintiff's prior medical reports or history, did not communicate with the plaintiff's prior doctors before forming causation opinion, and was unaware about prior injuries the plaintiff sustained in accidents)). Indeed, apart from Defendant's experts' testimony regarding her preexisting degenerative conditions, the court has received no evidence that Plaintiff had any significant and relevant preexisting injuries, suffered from similar symptoms to her shoulder, neck, and lower back prior to the accident, or underwent any prior traumatic events that could have caused her resulting injuries.

The court further finds persuasive Dr. Hutchison's opinion regarding the permanency of Plaintiff's injuries as reflected in his comprehensive orthopedic narrative and testimony at trial. *See* Pl. Ex. 9 (Dkt. 147-9 at 43). This opinion was rendered after Plaintiff had completed her therapy and was based on Dr. Hutchison's finding that Plaintiff had reached maximum medical improvement from her combined conditions. (*Id.*) The evidence reflects that Plaintiff's right shoulder rotator cuff tear would not have healed on its own, absent surgical intervention, and that she would continue to experience symptoms from her conditions even after physical therapy. *See* (*id.* at 5); Trial Tr. Vol. 4, 94:6–96:1. Indeed, Dr. Hutchison's treatment notes of Plaintiff further reflect that despite her improvement following physical therapy, she was discharged with instructions to maintain her progress through the use of a home exercise program. Pl. Ex. 9 (Dkt. 147-9 at 20); *see also* Pl. Ex. 11 (Dkt. 148-1 at 7–10)

(physical therapy discharge summary noting need for continued home exercise program).  Plaintiff also testified that if she does not complete her home exercise program, she feels pain and discomfort in her shoulder, which is consistent with Dr. Hutchison's treatment plan.  *See* Trial Tr. Vol. 5, 89:11–24.  Dr. Hutchison also based his permanency rating on Plaintiff's combined impairments, including her cervical spine, which Plaintiff continued to complain about hurting even after completing her physical therapy.  Pl. Ex. 9 (Dkt. 147-9 at 20) (September 24, 2019 note reflecting that "[i]n regards to her cervical spine, [Plaintiff] continues to have significant pain and limitations R>L").  While the court recognizes the lack of relevant medical treatment between Plaintiff's September 2019 appointment and August 2022, Plaintiff also credibly testified regarding the continued effect that her injuries have on her life, which is consistent with Dr. Hutchison's permanency assessment.  *See, e.g.*, Trial Tr. Vol. 5, 92:19–21, 101:3–105:7.

The court therefore finds that Plaintiff has met her burden by a preponderance of the evidence to establish that the March 5, 2019 accident caused Plaintiff permanent injuries to her right shoulder and cervical spine and non-permanent injuries to her lumbar spine.  *See, e.g.*, *Wald*, 64 So. 3d at 1207 (finding plaintiff was entitled to noneconomic damages for permanent injury that caused plaintiff "sensitivity and discomfort, especially if he permitted children to sit on his lap"); *Sullivan v. Price*, 386 So. 2d 241, 243 (Fla. 1980) (finding standard for permanent injury "clearly met" where plaintiff exhibited "permanent scar from the surgical insertion and removal of the pin in his shoulder"); *Colbert v. United States*, No. 3:09-cv-998-J-20JRK, 2014 WL

11353232, at *14–15 (M.D. Fla. Mar. 6, 2014) (finding evidence sufficient that plaintiff suffered a permanent injury in the form of a labral tear in his right shoulder that required surgery); *Triolo v. United States*, No. 3:18-cv-919-MMH-JBT, 2022 WL 843580, at *18 (M.D. Fla. Mar. 22, 2022) ("In sum, although the Court bears reservations about the value of [treating physician's] causation testimony, on the current record with no countervailing explanation for Triolo's pain following the accident, the Court finds, based on a preponderance of the evidence, that the accident caused permanent injuries to Triolo's spine.")

### 3. **Damages**

#### i. **Property Damage**

The court finds that Plaintiff has established by a preponderance of the evidence that she is entitled to property damages caused by the accident.  In Florida, the measure of property damages includes "the reasonable cost of repair, if it was practicable to repair the [vehicle], with due allowance for any difference between its value immediately before the [incident] and its value after repair . . . [taking] into consideration any loss to claimant for towing[.]"  Fla. Standard Jury Instruction (Civil) 501.2h (cleaned up).  The court has not received evidence reflecting the value of Plaintiff's vehicle either before or after repair, however, the evidence reflects that the cost to tow Plaintiff's vehicle from the scene of the accident was $200 and the estimate to repair Plaintiff's vehicle totals $10,860.85.  Joint Exs. 2, 3 (Dkts. 154-1, 154-2).  Defendant also does not challenge that Plaintiff is entitled to the full estimate to repair her vehicle.  *See* (Dkt. 165 at 14-16 (including $10,860.85 in property damage in

Defendant's damage calculations).)   Accordingly, the court finds that Plaintiff is entitled to $11,060.85 in property damages caused by the March 5, 2019 accident.

### ii. Past Medical Bills

The court finds that Plaintiff has established by a preponderance of the evidence that she is entitled to damages for her past medical bills that were reasonable and necessarily obtained by Plaintiff.  *See* Fla. Standard Jury Instruction (Civil) 501.3 (claimant entitled to the "reasonable value or expense of . . . medical care and treatment necessarily or reasonably obtained by claimant in the past") (cleaned up). As discussed above, the court finds that Plaintiff has incurred $96,183.62 in past medical bills and that those bills are reasonable and necessary for treatment Plaintiff underwent as a result of the March 5, 2019 accident.  In making this finding, the court accepts the testimony of Plaintiff's treating physicians that the bills were reasonable and necessary to treat Plaintiff's injuries related to the March 5, 2019 accident.  *See* Trial Tr. Vol. 2, 74:19–76:8, 135:13–136:20, 144:16–145:4, 164:24–165:14; Trial Tr. Vol. 3, 39:12–40:10.

Further, in a negligence action arising from the aggravation of a pre-existing condition, the finder of fact "should attempt to decide what portion of claimant's condition resulted from the aggravation or activation" and if able "should award only those damages resulting from the aggravation or activation."   Fla. Standard Jury Instruction (Civil) 501.5a (cleaned up).  However, if the finder of fact "cannot make that determination, or if it cannot be said that the condition would have existed apart from the injury, then [damages should be awarded] for the entire condition suffered by

- 69 -

claimant." *Id.* (cleaned up); *see also Thomason v. Gordon*, 782 So. 2d 896, 899 (Fla. 5th DCA 2001); *Boccio v. United States*, No. 8:09-cv-00475-T24EAJ, 2010 WL 2734478, at *4 (M.D. Fla. July 8, 2010).  Here, the medical experts testified regarding Plaintiff's preexisting degenerative conditions in her cervical spine and shoulder.  *See, e.g.*, Trial Tr. Vol. 3, 29:23–30:9, 88:6–18, 93:6–11, 122:13–17; Trial Tr. Vol. 4, 73:16–22. However, to the extent that Plaintiff's injuries are an activation or aggravation of her preexisting degenerative conditions, the court cannot determine what, if any, portion of Plaintiff's resulting injuries is due to those conditions given the lack of evidence as to Plaintiff's condition before the accident.  Accordingly, the court finds that Plaintiff is entitled to damages for "the entire condition."  Fla. Standard Jury Instruction (Civil) 501.5a.

In its answer to Plaintiff's Complaint, Defendant raised as an affirmative defense that it is exempt from tort liability for damages to the extent that PIP benefits have been or are payable to Plaintiff for her injuries.  (Dkt. 7 at 8); *see* Fla. Stat. § 627.736(3) ("An injured party . . . shall have no right to recover any damages for which personal injury protection benefits are paid or payable."); *see Norman v. Farrow*, 880 So. 2d 557, 560 (Fla. 2004) ("[S]ection 627.736(3) dictates that an insured plaintiff has 'no right to recover' damages paid or payable by PIP benefits.").  Plaintiff concedes that Defendant is entitled to $11,449 in set-offs to the past medical bills for PIP payments and adjustments.  (Dkt. 162 at 64.)  Thus, the court finds that Plaintiff is entitled to damages for past medical bills in the amount of $84,734.62.

### iii.  Future Medical Costs

The court finds that Plaintiff has failed to establish by a preponderance of the evidence that she is entitled to damages for future medical costs. *See* Fla. Standard Jury Instruction (Civil) 501.2b. (allowing damages for medical expenses "to be so obtained in the future"). In support of her request for future medical expenses, Plaintiff relies on the comprehensive orthopedic narrative and testimony of Dr. Hutchison in which he opined as to reasonable medical care and its costs that Plaintiff could expect to incur in the future. Pl. Ex. 9 (Dkt. 147-9 at 102.) While the court finds this report and Dr. Hutchison's testimony to be persuasive in establishing Plaintiff's permanent injuries, the evidence weighs against Plaintiff's seeking and receiving future medical care. For instance, Plaintiff was discharged from her physical therapy and her initial course of treatment with Dr. Hutchison with a plan for only a home exercise program to accommodate her permanent injuries rather than a prescribed course of medical treatment. *See* Pl. Ex. 9 (Dkt. 147-9 at 20); Pl. Ex. 11 (Dkt. 148-1 at 7–10).

Further, Plaintiff testified that she does not "go to therapy anymore" and testified that she plans to get injections only "when [she] cannot deal with the pain anymore. If the medicine doesn't help, then I'm going to have to get it then." Trial Tr. Vol. 5, 111:15–22. However, the court notes the nearly three-year gap in treatment related to the accident from Plaintiff's final visit with Dr. Hutchison in September 2019 to her visits with Dr. Hutchison and Dr. James in August 2022. Significantly, although Dr. Hutchison identified several potential treatments for Plaintiff's future pain in his November 2019 narrative report, including the potential need for intermittent physical therapy, MRI and CT diagnostics, and injections, when Plaintiff returned to care in

August 2022, Dr. Hutchison's only recommendations were that Plaintiff "continue performing the home exercise program as routine maintenance for her shoulder" and that "if the pain increases she would be free to call us for a corticosteroid injection in to the subacromial space." Pl. Ex. 9 (Dkt. 147-9 at 102.) Dr. Hutchison did not advise Plaintiff regarding the need for additional physical therapy or diagnostic imaging, and indeed, Plaintiff testified that Dr. Hutchison has not talked to her about the need for future physical therapy and that Plaintiff would continue doing exercises at home. Trial Tr. Vol. 5, 112:3–13. Further, despite offering the injections, Dr. Hutchison noted that Plaintiff "is quite needle phobic and would like to avoid injections if possible." (Dkt. 147-9 at 102.) Similarly, Dr. James, whom Plaintiff saw for treatment of her cervical spine on August 8, 2022, noted only that Plaintiff "does not want to proceed with invasive care" and he would "see her back as needed." (Dkt. 147-9 at 103.) Thus, the weight of the evidence does not support Plaintiff's entitlement to future medical costs in relation to the March 5, 2019 accident.

### iv. Non-Economic Damages

Having concluded that Plaintiff suffered permanent injuries as a result of the March 5, 2019 accident, the court finds that Plaintiff is entitled to damages for pain, suffering, mental anguish, inconvenience, and loss of capacity to enjoy life. Fla. Stat. § 627.737(2); *Wald v. Grainger*, 64 So. 3d 1201, 1206–07 (Fla. 2011). With respect to these non-economic damages, both in the past and experienced in the future, "[t]here is no exact standard for measuring such damage. The amount should be fair and just in light of the evidence." Fla. Standard Jury Instruction (Civil) 501.2.

Upon consideration of the evidence presented at trial, the court finds it fair and just to award Plaintiff $100,000 in past non-economic damages for her pain, suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life resulting from the March 5, 2019 accident.  In making this finding, the court finds credible Plaintiff's testimony regarding the pain she suffered as a result of the accident. Specifically, Plaintiff exhibited genuine emotion during her testimony regarding its resulting impact on her capacity to enjoy life as discussed above.

The court also finds it fair and just to award Plaintiff $33,500 in future non-economic damages for her future pain, suffering, mental anguish, inconvenience, and loss of capacity for the enjoyment of life caused by the March 5, 2019 accident.  As stipulated by the parties, Plaintiff's average life expectancy based on her age at trial was 33.5 years, according to the Social Security Administration's life expectancy tables. (Dkt. 114 at 14); Pl. Ex. 14 (Dkt. 148-4).  The court finds this award fair and just in light of Plaintiff's credible testimony that she continues to be affected by her permanent injuries but recognizing the greatly decreased severity of her non-economic injuries as evidenced by the nearly three-year gap in her seeking treatment for her injuries.  *See, e.g.*, *Triolo*, 2022 WL 843580, at *20 (finding combined award of $145,000 in past and future noneconomic damages to be appropriate where "overall [plaintiff's] pain is less severe than described"); *Torres-torres v. KW Int'l, Inc.*, No. 5:18-cv-164-OC-30PRL, 2020 WL 1820754 (M.D. Fla. Feb. 20, 2020), ECF No. 118 (jury verdict in automobile negligence action finding plaintiff suffered a permanent injury caused by the accident and awarding $114,500 in past non-economic damages and $0

in future non-economic damages); *McIntyre v. United States*, No. 5:14-cv-164-OC-10PRL, 2016 WL 4702417, at *6 (M.D. Fla. Sept. 8, 2016) (awarding $150,000 in total past and future pain and suffering resulting from permanent injuries caused by vehicle accident).

The court also rejects Defendant's argument, without citation to authority, that Plaintiff's unrelated treatment for injuries to her left shoulder, lip, and tooth that she sustained in February 2020 bars her recovery of future damages related to the March 5, 2019 accident and injuries to her right shoulder and cervical spine. *See* (Dkt. 163 at 13.) Florida law recognizes that Defendant's negligence may be the legal cause of Plaintiff's injury even though it operates in combination with some intervening cause where "the resulting loss, injury, or damage was a reasonably foreseeable consequent of the negligence and the negligence contributes substantially to producing it." Fla. Standard Jury Instruction (Civil) 401.12c; *Mozer v. Semenza*, 177 So. 2d 880 (Fla. 3d DCA 1965). Further, where a plaintiff suffers injuries in a subsequent event, the finder of fact "should try to separate the damages caused by the two events and award claimant money only for those damages caused by defendant." Fla. Standard Jury Instruction (Civil) 501.5b (cleaned up). However, if the finder of fact cannot separate some or all of the damages, claimant must be awarded any damages that cannot be separated as if they were all caused by the defendant. *Id.*; *Gross v. Lyons*, 763 So. 2d 276 (Fla. 2000).

Upon consideration, the court finds that Defendant's negligence contributed substantially to the future non-economic damages incurred by Plaintiff as reflected in

- 74 -

her testimony, and that Plaintiff's medical care in February 2020 for different injuries did not act as a subsequent intervening cause to bar any future recovery.  *See, e.g.*, *Republic Servs. of Fla., L.P. v. Poucher*, 851 So. 2d 866, 871 (Fla. 1st DCA 2003) (subsequent injuries in fall raised fact issues for jury as to whether future costs of medical treatment would be unrelated to the incident at issue); *Colbert*, 2014 WL 11353232, at *19 (awarding future damages to plaintiff from car accident despite subsequent falls resulting in different injuries).  Further, to the extent that Plaintiff did experience ongoing injuries from her fall in 2020 (and the court has no medical records to reflect that is the case), the court cannot apportion damages between those injuries and the ongoing permanent injuries and non-economic damages that she suffered as a result of the March 5, 2019 accident.  *See Gross*, 763 So.2d 276.  Thus, the court declines to reduce Plaintiff's future non-economic damages as a result of her February 20, 2020 medical treatment.

## C. Comparative Negligence

Defendant asserts an affirmative defense that Plaintiff was comparatively negligent in causing the March 5, 2019 accident and seeks to have her damages reduced by 80 percent for her own negligence.  (Dkt. 7 at 6; Dkt. 165 at 11–12.)  Florida law applies comparative negligence principles and directs courts in negligence actions to "enter judgment against each party liable on the basis of such party's percentage of fault[.]"  Fla. Stat. § 768.81.  "Comparative negligence is an affirmative defense; thus, the party asserting the defense bears the burden of proving that the negligence of the other party was a cause of the accident."  *Bongiorno*, 159 So. 3d at 1029 (citing *Philip*

*Morris USA, Inc.* 933 So. 2d at 697); *Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So. 3d 1086, 1096–97 (Fla. 2010).

Defendant relies on Ms. Prieto's and Dr. Cummings's testimony that the USPS vehicle was either established or nearly established on Lorraine Road at the time of the accident, and that Plaintiff violated her duty to Ms. Prieto to drive carefully and avoid hitting other drivers and section 316.085(1) of the Florida Statutes[34] by improperly crossing a double-yellow line to pass the USPS vehicle in the northbound lane before being forced into the southbound lane by oncoming traffic and into the USPS vehicle. (Dkt. 163 at 21–23.)[35] However, as discussed at length above, the court does not find Ms. Prieto's version of the March 5, 2019 accident to be credible, as it is not supported by the physical evidence from the scene, the testimony of Trooper Smith, and the testimony of both Plaintiff's and Defendant's experts. The court therefore finds that Defendant has failed to meet its burden by a preponderance of the evidence that Plaintiff was comparatively negligent in the March 5, 2019 accident.[36] *See Bongiorno*, 159 So. 3d at 1029; *Hoffman*, 280 So. 2d at 438.

---

[34] Florida Statute section 316.085(1) provides:
> No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless authorized by the provisions of this chapter and unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the operation of any vehicle approaching from the opposite direction of any vehicle overtaken.

[35] The court notes that upon its review of the photographs in evidence, the two lanes of Lorraine Road at the scene of the accident were divided by a single, broken yellow line, rather than "two solid yellow lines" as argued by Defendant. *See, e.g.*, Pl. Ex. 26-0002 (Dkt. 150-2); Pl. Ex. 26-0011 (Dkt. 150-11).

[36] In its proposed findings of fact and conclusions of law, Defendant also raises Florida's "rear-end presumption" as it applies to the impact between the USPS vehicle and Plaintiff's vehicle following the initial collision. (Dkt. 163 at 19–20); *see Rementer v. United States*, No. 8:14-cv-642-T-17MAP, 2017 WL 1095054, at *17 (M.D. Fla. Mar. 21, 2017) ("Under Florida law, there is a rebuttable presumption

### D. Mitigation of Damages

Defendant asserts as an affirmative defense that Plaintiff failed to take reasonable measures to mitigate her damages and that Plaintiff's recovery should therefore be proportionately reduced. (Dkt. 7 at 7.)  Defendant seeks a reduction of Plaintiff's damages by 2 percent and argues that Plaintiff failed to mitigate her damages by failing to seek immediate medical attention following the accident.  (Dkt. 165 at 12–13.)  Under Florida law, "mitigation of damages—also called avoidable consequences—is typically directed at a plaintiff's action or inaction that occurs after the defendant's wrongful act and magnifies the resulting damages." *Rubinstein v. Yehuda*, 38 F.4th 982, 1000 (11th Cir. 2022) (citing *Parker v. Montgomery*, 529 So. 2d 1145, 1147 (Fla. 1st DCA 1988)).  The failure to obtain proper medical care after an accident may lessen a plaintiff's recovery for any subsequent aggravation of the condition.  *See Ridley v. Safety Kleen Corp.*, 693 So. 2d 934, 942 (Fla. 1996).  The duty to mitigate damages "is different than comparative negligence, which generally involves a plaintiff's ability to have avoided injury in the first place. *Rubinstein*, 38 F.4th at 1000 (citing *Ridley*, 693 So. 2d at 942).

Defendant argues that Plaintiff "while working in a nursery and going about her activities of daily living, waited 12 days before seeing a doctor regarding the injuries

---

of negligence that attaches to the rear driver in a rear-end motor vehicle collision case.") (citing *Eppler v. Tarmac America, Inc.*, 752 So. 2d 592, 594 (Fla. 2000)).  Defendant argues that it has presented sufficient evidence to overcome this presumption because the accident caused the USPS vehicle to rear-end Plaintiff's vehicle and Defendant established Plaintiff's comparative negligence.  (Dkt. 163 at 20.)  However, because the court finds that Defendant has failed to establish Plaintiff's comparative negligence by a preponderance of the evidence, the court does not consider Defendant's argument that it overcame the rear-end presumption due to Plaintiff's comparative negligence.

from the accident." (Dkt. 165 at 13.) Defendant also relies on the report from Dr. Indelicato, in which he opined on April 15, 2019 that "the absence of immediate medical attention . . . for this patient could reasonably be expected to result in serious jeopardy to the patient's health; or serious impairment to bodily functions; or serious dysfunction of any bodily organ or part." Def. Ex. 7 (Dkt. 144-7 at 10).

Upon consideration, the court finds that Defendant has failed to establish Plaintiff's failure to mitigate damages by a preponderance of the evidence. As discussed above, the court assigns little weight to Dr. Indelicato's opinion and prognosis as it is inconsistent with the doctor's notes from the examinations on which it is based. *Compare* Def. Ex. 7 (Dkt. 144-7 at 10) (Dr. Indelicato issuing prognosis on April 15, 2019 based on examinations conducted by Dr. Nicole Santana-Rodriguez) *with* (*id.* at 16) (Dr. Santana-Rodriguez's April 8, 2019 note stating that "[c]urrently, the prognosis for [Plaintiff] is guarded because the patient hasn't received enough treatments to correctly evaluate a prognosis."). Nevertheless, the court also finds Dr. Indelicato's statement regarding the need for medical treatment to be prospective in nature rather than a retroactive assessment of Plaintiff's lack of medical treatment immediately following the accident.

Furthermore, Defendant's statement that Plaintiff went 12 days without seeing a doctor is contradicted by the record, which reflects that Plaintiff went to the emergency room at Manatee Memorial Hospital 3 days after the accident on March 8, 2019. *See* Pl. Ex. 1 (Dkt. 147-1 at 13). The court also credits Plaintiff's statement to her insurance agency on the day of the accident that although she was in some pain,

she was unsure whether to seek medical care.  Trial Tr. Vol. 4, 210:17–20.  Dr. Hutchison testified individuals "very frequently" sustain an injury in accidents similar to the one at issue here and wait two or three days to go to the emergency room.  Trial Tr. Vol. 2, 114:1–17.  Defendant's expert Dr. Bullock similarly testified that it would "absolutely not" be unusual for an individual to wait two or three days to go to the emergency room following a similar accident.  Trial Tr. Vol. 4, 100:18–22.

Further, although Plaintiff continued to work during the course of her treatment, there is no evidence that she did so against the recommendation of her doctors or that Plaintiff suffered further injury for having worked.  Indeed, following her shoulder surgery, the record reflects that Plaintiff was compliant with Dr. Hutchison's instructions to wear her shoulder immobilizer, Plaintiff testified that even when she returned to work, she continued using her sling or right shoulder immobilizer as ordered by Dr. Hutchison, and Plaintiff completed her course of physical therapy following surgery.  Pl. Ex. 9 (Dkt. 147-9 at 14, 16); Trial Tr. Vol. 5, 90:19–23.  Thus, the court does not find that Defendant has established by a preponderance of the evidence that Plaintiff failed to mitigate her damages and declines to reduce Plaintiff's damages as such.  *Cf. Triolo*, 2022 WL 843580, at *19 (finding 10 percent reduction for failure to mitigate damages appropriate where plaintiff declined to participate in prescribed physical therapy following surgery).

## CONCLUSION

Accordingly, based on the above findings of fact and conclusions of law:

1.      The Clerk of Court is directed to enter judgment in favor of Plaintiff Marisa Porras in the amount of $229,295.47.

2.      The damages include:

   a.      $11,060.85 in property damage;

   b.      $84,734.62 in past medical bills;

   c.      $100,000 in past non-economic damages; and

   d.      $33,500 in future non-economic damages.

3.      The Clerk is further directed to terminate all pending motions and deadlines and close the case.

4.      The court retains jurisdiction over this matter to address the further issue raised by the parties, if applicable, as to whether Florida Statutes section 768.79 and Florida Rule of Civil Procedure 1.442 apply to this matter as reflected in the Joint Pretrial Statement.  (Dkt. 114 at 15.)

**ORDERED** in Tampa, Florida, on March 21, 2023.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record